**2014-1544(L); -1563**

# In The
# United States Court Of Appeals
# For The Federal Circuit

## HYPOXICO INC.,

*Plaintiff - Appellant,*

v.

## COLORADO ALTITUDE TRAINING LLC,

*Defendant - Cross-Appellant.*

Appeal from the United States District Court for the
Southern District of New York No.1:02-cv-06191-TPG.

––––––––––––––––

## BRIEF OF APPELLANT

––––––––––––––––

Roger S. Thompson
THE LAW OFFICES OF
  ROGER S. THOMPSON
116 Pinehurst Ave., Suite D-14
New York, NY  10033
(212) 923-5145

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street  ♦  Suite 230  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) certifies the following (use "None" if applicable; use extra sheets if necessary):

**Appellant Hypoxico Inc.**

1.    The full name of every party or amicus represented by me is:

**Hypoxico Inc.**

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

**Hypoxico Inc.**

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

**None**

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**Martin B. Pavane and Roger S. Thompson (both formerly) of Cohen Pontani Lieberman & Pavane LLP; and Alan Tenenbaum of Tannenbaum Helpern Syracuse & Hirschtritt LLP**

| | |
|---|---|
| September 11, 2014 | /s/ Roger S. Thompson |
| Date | Signature of counsel |
| | /s/ Roger S. Thompson |
| | Printed name of counsel |

Please Note: All questions must be answered
cc: Charles D. Hoffmann, Esq.

i

# TABLE OF CONTENTS

**PAGE:**

CERTIFICATE OF INTEREST ........................................................................... i

TABLE OF CONTENTS ................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. v

I.     STATEMENT OF RELATED CASES ................................................... 1

II.    JURISDICTIONAL STATEMENT .................................................... 1

III.   STATEMENT OF THE ISSUES ........................................................ 2

IV.    STATEMENT OF THE CASE AND FACTS ...................................... 3

       A.     The technology .......................................................................... 3

       B.     CAT ............................................................................................ 7

       C.     CAT's products. ....................................................................... 9

              a.     CAT's Room Systems ..................................................... 10

              b.     CAT's Tent Systems ...................................................... 11

       D.     The proceedings before the first trial .................................. 15

       E.     The first trial .......................................................................... 17

              a.     The claims at issue ......................................................... 17

              b.     Relevant Evidence ......................................................... 22

              c.     Jury Charge .................................................................... 23

       F.     Verdict and post-trial motions .............................................. 27

       G.     Proceedings after the first trial and before the second trial ................. 29

H.    The second trial ...................................................................30

     a.    Rulings during trial ...............................................30

     b.    Claim constructions ..............................................31

I.    Second verdict and subsequent proceedings ......................34

V.    SUMMARY OF THE ARGUMENT ..................................................36

VI.    ARGUMENT..........................................................................................37

    A.    Standard of Review – New Trial.......................................38

    B.    Standard for the grant of a New Trial ...............................38

     a.    New Trial – Infringement ......................................39

     b.    New Trial – Lost Profits ........................................45

     c.    New Trial – Inducement ........................................46

    C.    Standard for Review – JMOL (Second Trial) ...................46

    D.    Standard for JMOL...........................................................47

     a.    Standard for Overturning a Jury Verdict as a Matter of Law........................................................................47

     b.    There is substantial evidence that CAT's "controlled" systems infringe. .......................................49

     c.    The JMOL Decision................................................50

    E.    Standard of Review – Claim Construction.........................50

    F.    Claim construction ............................................................51

     a.    "Portable"...............................................................52

     b.    "Vents" and "apertures"........................................54

    G.    The Court's JMOL grant based on weighing evidence.....................54

H.     Hypoxico's Motion in Limine – 28 U.S.C. § 1498(a) ........................56

     a.     Standard of Review – Limine motion --§ 1498(a)....................56

     b.     Argument – § 1498(a) ...............................................................56

VII.   CONCLUSION............................................................................................57

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**PAGE(S):**

**CASES:**

*A.B. Dick Co. v. Burroughs Corp.*,
   713 F.2d 700 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984) ...... 39, 41

*Advanced Software Design Corp. v. FRB of St. Louis*,
   583 F.3d 1371(Fed. Cir. 2009) .......................................................56

*Amorgianos v. Amtrak*,
   303 F.3d 256 (2d Cir. N.Y. 2002) ................................................38

*Butamax(TM) Advanced Biofuels LLC v. Gevo, Inc.*,
   746 F.3d 1302 (Fed. Cir. 2014) ...................................................50

*Carl Zeiss Stiftung v. Renishaw PLC*,
   945 F.2d 1173 (Fed. Cir. 1991) .............................................. 43, 44

*Cash v. County of Erie*,
   654 F.3d 324 (2d Cir. N.Y. 2011) .......................................... 46, 47

*Curry v. City of Syracuse*,
   316 F.3d 324 (2d Cir. N.Y. 2003) ................................................56

*DLC Management Corp. v. Town of Hyde Park*,
   163 F.3d 124 (2d Cir. 1998) .........................................................38

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010) ...................................................53

*Hill-Rom Servs. v. Stryker Corp.*,
   755 F.3d 1367 (Fed. Cir. 2014) ...................................................52

*Hypoxico Inc. v. Colo. Altitude Training*,
   630 F. Supp. 2d 319 (S.D.N.Y. 2009) .........................................28

*InTouch Techs., Inc. v. VGo Communs., Inc.*,
   751 F.3d 1327 (Fed. Cir. 2014) ...................................................38

*Lighting Ballast Control LLC v. Philips Elecs. North Am. Corp.*,
        744 F.3d 1272 (Fed. Cir. 2014) ....................................................51

*Marcic v. Reinauer Transp. Cos.*,
        397 F.3d 120 (2d Cir. N.Y. 2005) ..............................................56

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
        244 F.3d 1365 (Fed. Cir. 2001) ..................................................46

*Omega Eng'g, Inc. v. Raytek Corp.*,
        334 F.3d 1314 (Fed. Cir. 2003 .....................................................51

*Peters v. Baldwin Union Free Sch. Dist.*,
        320 F.3d 164 (2d Cir. N.Y. 2003) ...............................................55

*Reeves v. Sanderson Plumbing Products, Inc.*,
        530 U.S. 133 (2000)............................................................. 48, 50

*Saloomey v. Jeppesen & Co.*,
        707 F.2d 671 (2d Cir. 1983) ........................................................39

*Siemens Med. Solutions USA, Inc. v.*
*Saint-Gobain Ceramics & Plastics, Inc.*,
        637 F.3d 1269 (Fed. Cir. 2011). ..................................................45

*Starhome GmbH v. AT&T Mobility LLC*,
        743 F.3d 849 (Fed. Cir. 2014) .....................................................51

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
        299 F.3d 1313 (Fed. Cir. 2002) ...................................................51

*Tennant v. Peoria & Pakin Union Ry. Co.*,
        321 U.S. 29 (1944)............................................................... 47, 48

*Thorner v. Sony Computer Entm't Am. LLC*,
        669 F.3d 1362 (Fed. Cir. 2012) ...................................................51

*U.S. v. Space Hunters, Inc.*,
        429 F.3d 416 (2d Cir. 2005) ........................................................50

*Williams v. County of Westchester*,
    171 F.3d 98 (2d Cir. 1999) ..........................................................47

*Zellner v. Summerlin*,
    494 F.3d 344 (2d Cir. 2007) ......................................................48

**STATUTES:**

28 U.S.C. § 1292(c)(2).................................................................35

28 U.S.C. § 1295(a)(1)..................................................................1

28 U.S.C. § 1338(a) ......................................................................1

28 U.S.C. § 1498(a) ................................................2, 29, 37, 56

**CONSTUTIONAL PROVISION:**

U.S. Const. Amend VII..........................................................2, 37

**RULES:**

Fed. R. Civ. P. 50 .......................................................................47

Fed. R. Civ. P. 50(a)(1)...............................................................47

Fed. R. Civ. P. 59 .......................................................................38

## I.    STATEMENT OF RELATED CASES

There are no related cases in the chain of this appeal.  However, the Defendant/Appellee/Cross-Appellant Colorado Altitude Training, LLC ("CAT") has filed for bankruptcy in the District of Colorado, and that case, *In re Colorado Altitude Training, LLC*, 10-21951 EEB (Bankr. D. Colo.) is still pending.  The award of damages to the Plaintiff/Appellant/Cross-Appellee Hypoxico, Inc. ("Hypoxico") pursuant to this appeal will "directly affect" the proceedings in that matter, and so it is believed to be a "related case" within the meaning of Fed. Cir. R. 47.5(b)

## II.    JURISDICTIONAL STATEMENT

The Court below had jurisdiction over the case under 28 U.S.C. § 1338(a), as the action included claims for patent infringement.  Hypoxico owned the patents-in-suit at the time the action was filed.  A2074.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1), as it is an appeal of a final judgment entered on May 21, 2014 (A1-2) by a United States District Court (the Southern District of New York) in an action brought, at least in part, under 28 U.S.C. § 1338(a).

The Notice of Appeal was filed June 11, 2014.  A3523.

1

## III.    STATEMENT OF THE ISSUES

1.    Considering the Seventh Amendment, and relevant precedent, did the Court properly overturn two separate jury verdicts finding that the defendants infringed the two patents-in-suit?

If the first jury verdict is re-instated, then all issues regarding the second trial become moot.    However, if the first jury verdict is not re-instated, then the following issues concerning the second trial are presented:

2.    Did the Court properly, *sua sponte*, change its *Markman* claim constructions from the first trial, and restrict the new definitions of the disputed terms beyond their normal meaning?

3.    Did the Court properly remove the issue of lost profits from the jury?

4.    Did the Court properly remove the issue of whether Larry Kutt induced infringement because the Court didn't "question the veracity of Mr. Kutt's testimony", although the second jury would have been free to do so?

5.    Did the Court properly allow CAT to present evidence to the jury regarding sales allegedly excluded from damages under 28 U.S.C. § 1498(a), even though the issue was first raised in a section of CAT's rebuttal damages expert just a few weeks before trial and long after pleadings closed?

## IV.    STATEMENT OF THE CASE AND FACTS

The instant case involves two patents, U.S. Pat. Nos. 5,799,652 ("the '652 Patent) and 5,964,222 ("the '222 Patent"), a continuation-in-part of the '652 Patent.  Both patents claimed devices invented by Mr. Igor "Gary" Kotliar, and assigned to his company, Hypoxico, Inc., the plaintiff herein.  A2074.  Mr. Kotliar was an award-winning science student and an inventor in his native Russia before emigrating to the United States in pursuit of the proverbial American Dream. A952.

### A.    The technology

It has been long-known that training at high altitude provides athletes with certain physiological benefits which can carry over into their on-field performance. A955.  The benefits which flow from being at high altitude stem from the fact that there is a lower oxygen content, *i.e.*, fewer oxygen molecules per unit volume of air, at higher altitudes than at lower altitudes, A956, so the body has to work harder to function at high altitudes.  The percentage of oxygen in the ambient air is generally the same, about 21%, everywhere on earth.  A956.  At higher altitudes, the pressure is less, and there is less overall air, even though the relative oxygen content is the same.  A956.

This "thin air", having fewer oxygen molecules per breath, (A956) is why visitors to high-altitude locations, such as Denver, have difficulty breathing upon

arrival. Once acclimated, the body gains certain benefits which carry over upon returning to lower altitudes, such as the ability to process oxygen more efficiently. A4148-49; A5755. Athletes have attempted to use this physiological effect to boost their performance by training "at altitude" and then returning to lower altitude for competition. A problem exists in that not all athletes have the opportunity to train at actual high altitudes, as they have lives (*e.g*., jobs and families) which may keep them at other, lower, altitudes. There was a need, therefore, for some means by which athletes could benefit from high altitude training conditions while physically present at low altitudes.

At the time of the invention (mid-1995), the prevailing technology was the so-called "Gamow" Chamber, which was a large tube having thick metal walls (A958) into which a user could place him- or herself, and from which air could be drawn, thereby creating an isolated artificial low-oxygen (and low pressure) environment in which the user could lie down (it was too confined to stand) and rest for extended periods. The thick metal walls were needed to withstand the massive pressure differential between the inside and outside environments (even a 1 lb/in$^2$ differential could mean a more than one-ton pressure differential over a surface of only about 3' x 5', the size of a small office desk).

One of the witnesses, Shaun Wallace (about whom more presently), a British Olympic cyclist, used such a Gamow Chamber at the Atlanta Olympics. A1202.

4

The Chamber was so large and cumbersome it had to be set up in the open plaza outside the hotel.  A1202.

The drawbacks of these devices were many, including size, weight, convenience and the fact that the user, once inside, could not freely leave the Chamber without first normalizing the pressure in the Chamber.  A957.

Mr. Kotliar recognized that the benefits of high-altitude training could be realized more widely if there was some way to have a hypoxic (lower oxygen) environment at normobaric (ambient pressure) conditions.  He struck upon a new way to achieve that combination.  Instead of removing atmosphere from an enclosed space thereby creating a pressure differential between the interior and exterior environments, he would exchange the normoxic (normal oxygen) air in the enclosed environment with hypoxic air, 15% or even lower.  A957. The body would have the same number of oxygen molecules per breath as at higher altitudes, but the overall air pressure would be generally the same as the outside air pressure. By controlling the oxygen content of the enclosed environment, Mr. Kotliar could simulate the hypoxic conditions of high altitudes, without the need to maintain large (expensive!) structure to maintain large pressure differentials.  A957-58.  The elimination of the metal walls allowed for the use of simple plastic sheeting for walls (A988), and the generally equal air pressure would allow the user to enter or leave the enclosure as needed (A1005).  Further, the enclosure could be made

5

much larger than the Gamow Chamber, since it would be enclosed simply by plastic sheeting (or even the pre-built walls of a room, barn or gymnasium), thereby allowing the user to eat, sleep, train or work in a hypoxic environment.

There was one problem, however. While the conception was deceptively elegant, no commercially produced mechanism then existed for the generation of hypoxic air. Mr. Kotliar then had a second realization: he could take the output of a machine intended to generate pure or high-concentration oxygen, and take the *waste product* of that device, which is an atmospheric fraction having a lower oxygen concentration than ambient air and use that fraction to feed into the hypoxic enclosure, thereby creating the desired hypoxic normobaric environment. A958. The high oxygen fraction, the usually desired output of the device, was simply discarded.

Thus, with a practical and efficient way to provide equipment which could simulate high altitude, Mr. Kotliar formed Hypoxico and attempted to market his technology. Along the way, he filed the patent applications which matured into the two patents. The '652 Patent is directed to the basic Hypoxic Room Technology, and the '222 Patent to a Portable Tent version of the basic room system. The applications were assigned to Hypoxico, A963, by written agreements that were not recorded, and were eventually lost. A1057. The lost assignments were later

confirmed by confirmatory assignments which were recorded with the United States Patent and Trademark Office.  A4570A; A4571.

While acceptance of this new technology was gradual, Hypoxico was garnering favorable press notices after placement of one of its large room units in a fitness center in Manhattan.  A964.

Shortly after placing the first unit in the fitness center, Mr. Kotliar was contacted by Mr. Wallace (A965), who had been trying to develop his own hypoxic system, with an eye towards marketing it  (A989).  After meeting Mr. Kotliar and seeing his system in operation, Mr. Wallace agreed to sell Hypoxico products (A989), and he did so for several years, as a trusted and valued representative of Hypoxico.  Until he left to work for CAT.  A991.

### B.    CAT

CAT was founded in 1997 by Mr. Larry Kutt (A3001), a former executive recruiter with no technical background.  A1295; A3001. In the time frame of 1996-97, CAT was selling the Gamow Chamber.  A1476.  In the period of late October to early November of 1997, after the heavy media coverage of Hypoxico's product, Mr. Kutt contacted Hypoxico, seeking to license Hypoxico's technology.  A999; A4156.  Mr. Kutt and Mr. Kotliar exchanged proposals with the last offer being a royalty of 10% of gross sales, plus a guarantee that CAT would purchase its air separation units, the equipment that separated ambient air into hypoxic and

hyperoxic fractions, from Hypoxico. A5532. That would have provided a greater profit to Hypoxico than the license fee itself.

On September 1, 1998, the '652 Patent issued. A3.

On February 10, 1999, Mr. Kutt abruptly broke off further discussions, and claimed CAT would be selling a different type of product, a so-called "nitrogen product".[1] A4158.

On October 12, 1999, the '222 Patent issued. A14.

On November 30, 1999, counsel for CAT, Mr. Joseph E. Kovarik, wrote to Hypoxico suggesting that Hypoxico should license its patents to CAT because otherwise CAT would invalidate the patents with information in its possession, and that it would be better for Hypoxico to take a little found money from CAT rather than have the patents invalidated and lose everything. A4153-54. Counsel for Hypoxico wrote back to Mr. Kovarik asking for copies of the allegedly invalidating art. A4155. CAT did not respond. A2959.

It is also unclear as to whether CAT had received any opinion of counsel as to non-infringement, since the letter from Mr. Kovarik only spoke to validity issues. A4153-54. No actual opinion of counsel from Mr. Kovarik or any another attorney was ever produced by CAT, introduced at trial by CAT, or mentioned on

---

[1] A roughly contemporaneous technology existed in which the oxygen concentration in an enclosure was lowered by introducing pure nitrogen into a room, lowering the oxygen concentration by raising the level of potentially toxic nitrogen in the room.

any privilege log by CAT, even though all opinions of counsel had been requested during discovery.

Sometime in 2002, CAT began advertising its "new" product, the Colorado Altitude Tent, with its "Portability with Easy Setup" A5753; A5754. CAT also advertised that product as "the ultimate in portability". A5759.

Hypoxico attempted to determine the nature of CAT's products, but was unable to find out what CAT was doing until sometime later, and then, on August 2, 2002 (D.E. 1), filed the instant action for, *inter alia*, infringement of the '222 and '652 patents. The case was assigned to Judge Koeltl.

Mr. Kutt later testified that CAT ceased promoting the portability of the Colorado Altitude Tent shortly after it was commenced. A2997. That is, CAT discontinued promoting the portability of its tent products shortly after the instant action, in which CAT and Mr. Kutt were accused of infringing the '222 Patent and its claims for a "portable tent", was filed.

### C.    CAT's products.

Through the close of discovery, CAT sold essentially two types of systems: Rooms and Tents. No matter the type of system, there are two essential components of every product: an enclosure and a hypoxic air unit. A3436. The hypoxic air unit, or "air separation unit", provides hypoxic air to the enclosure to permit the simulation of altitude therein.

9

The enclosure may be an existing structure, such as an office or bedroom or a permanent structure established inside another, existing, structure (broadly, a "Room" system) (A4608; A4610), or be a separately provided freestanding enclosure, such as a tent or other structure (broadly, a "Tent" system) (A4600; A4602; A4606).

### a.   CAT's Room Systems

CAT's Room Systems are generally systems that include retrofitting existing structures, or, occasionally building new structures such as a new fitness center or barn.  They may include so-called equine systems (A4611), which are rooms used for horses, or rooms in private or commercial buildings.  CAT sells these room systems under several names, including the Colorado Mountain Room.  A4610.

In the Room Systems, the enclosure is the walls of the room, barn or other structure and the walls of the structure separate the environment inside the enclosure from the environment outside of the enclosure.  While the walls of the enclosures are generally solid, nearly all walls contain some form of opening through which air can leak, such as holes around light switches, around doors, windows, *etc.*  A1152-53.  These pre-existing openings allow air to flow out from the enclosure, thereby avoiding a buildup of pressure in the enclosure when hypoxic air is pumped in.  If it didn't have these openings, the system wouldn't

10

work, as pressure would build up in the room and the hypoxic air unit would eventually be unable to keep pumping hypoxic air into the enclosure. A1153.

> b.    *CAT's Tent Systems*

CAT's Tent Systems are enclosures which have plastic walls, ceilings, *etc.*, and are intended for use inside other rooms, such as a bedroom or hotel room. They all have a plastic supporting structure of some kind, and each supporting structure is assembled of varying lengths of plastic tubes or pipes. A3436. CAT's Tent Systems come in four sizes: the 150 Tent, the 315 Tent, the 430 Tent and the 535 Tent.

The 150 Tent is the smallest of the four, and is an admittedly portable tent. It is intended for traveling and to be placed on top of a single or queen-sized bed. A4606. At the second trial, CAT did not contest that the 150 Tent infringed the '222 Patent, and has stopped selling it. A3437.

The 315, 430 and 535 Tents all have floors, and enclosures made of a single piece of plastic which is supported by plastic tubing. A3437-38. The tubing can be assembled *in situ* at the customer's desired location, and then the plastic can be attached thereto. A4133; A5405-13.

The 315 Tent is large enough to accommodate a queen sized bed, and some small furniture therein. A4600. It is also known as the Colorado Altitude Tent (A5754; A2997), the Standard Tent or the Walk-In Tent (A4600). A sample of the

315 Tent was set up for inspection and viewing by both juries. A4658-66. The juries were able to touch, enter and walk around in the tent while in operation. The tent of the 315 Tent weighs 24 pounds, while the poles used to support the tent weigh 35 pounds and are as long as 7'6". A3435.

The 430 Tent is large enough to accommodate a King Size bed, plus some furniture. A4604. It is also known as the King Tent. A3000; A4602. The tent of the 415 Tent weighs 25 pounds, and the poles weigh 40 pounds with the longest segment being also 7'6". A3435. The second jury was shown a sample of the 415 tent and poles boxed up for transport. A3177

The 535 is the largest of the tents, and is generally custom made for a specific size and purpose. It is heavier and the poles are at least the size of the 430 Tent. A3435. Very few of these were sold.

Each of the Tent Systems was available for rental, meaning that the Tents can be set up, taken down and moved repeatedly. A5758. CAT also advises its customers how easy it is to move the Tents from place to place (A5753; A5754), and that the tents provide the "ultimate in portability" (A5759). CAT also instructs the customers on how to go about moving the tents, explaining that "[t]he ends of the poles are waxed at the factory to facilitate disassembly" (A4141), and reminding the customer that re-calibration may be necessary when the tent is moved (A4141).

Furthermore, each of the Tent Systems has a number of zippers in the walls to allow the opening of holes the walls for various reasons, including providing a means to enter or leave the room and running cables, wires, tubes, *etc*. into or out of the enclosure.  A4660; A4663-66.  These zippers may also be used to control the amount of hypoxic air in the enclosure, and thereby regulate the simulated altitude experienced within the enclosure.  A4138.  Mr. Kutt, in deposition testimony read into the record at the first trial, stated that controlling the altitude was one purpose of the zippers.  A1105.

Each of CAT's systems also has an air separation unit (A4600; A4602; A4606) which operates to draw in ambient air, and separate it into two fractions:  a hypoxic fraction which is fed into the CAT system (room or tent) and a hyperoxic fraction which is discharged to the environment.  All CAT systems, room or tent, have at least one air separation unit, and they all use the same unit.

CAT also sells a travel case for the air separation units.  A5630.  CAT has sold the travel case in conjunction with the sale of 315 Tents (A5482) and 430 Tents (A5483).  CAT also used promotional materials touting the use of a 315 Tent by a college football player, Anthony Gonzalez, while traveling, including setting up the tent in a hotel room.  A5733-35.

The Court below accurately and succinctly described the operation of the CAT systems (A2069-70):

13

The accused devices use an apparatus that separates air into low-oxygen (*i.e.*, "hypoxic") and high-oxygen components and then feeds the hypoxic air into an enclosed space, thereby creating a low-oxygen environment in that space. The enclosures used in these systems include rigid enclosures set up in a room, soft-walled tents, entire rooms, and even larger structures such as barns.

CAT's products can be categorized as "controlled" or "uncontrolled" systems. In the controlled systems, the air separation unit works in conjunction with a computer controller, which controls the activity of the air separation unit based on the current oxygen level, carbon dioxide level, barometric pressure, and temperature. In the uncontrolled systems, the air separation unit works independently, although a user can adjust the desired oxygen content. The uncontrolled systems can be further grouped into three subcategories. In the "blow-through" systems, the air separation unit resides outside of the enclosure. It takes in ambient air from outside the enclosure and then feeds hypoxic air into the enclosure. In "recirculating" systems, the air separation unit is also placed outside the enclosure, but takes in air from inside the enclosure. As the machine operates, it therefore continually takes in air that has already become somewhat hypoxic, rather than air with a normal oxygen level. Finally, in a "pump-out" system, the air separation unit resides within the enclosure, and takes in air from inside the enclosure. In all three types of uncontrolled systems, high-oxygen air is pumped outside the enclosure. The uncontrolled systems all depend on some air leaking out through the walls of the enclosure, in order to prevent the pressure inside the enclosure from becoming too high as air is pumped in.

No matter the type of system, or size of the enclosure, all CAT systems operate in essentially the same way with the same intended result: the oxygen content within the enclosure is altered to a desired hypoxic condition (usually corresponding to a desired altitude), and then maintained at that level for as long as the air separator stays on. A1118-19; A4141; A5605. In all cases, the sole mechanism for changing the oxygen concentration within the enclosure is the air

14

separation unit. In "controlled" systems, the output of the air separation unit is always controlled by the controller, but it is the air separation unit that actually feeds hypoxic air to the enclosure and therefor maintains the simulated atmosphere therein. A5607. The oxygen content within the enclosure is lower than that outside, to maintain the desired simulated altitude, and the walls of the enclosure separate the environment inside the enclosure from the environment outside the enclosure. A4660.

### D.    The proceedings before the first trial

The Complaint alleged, *inter alia*, infringement of the '652 and '222 patents directly by CAT and via inducement by Mr. Kutt. A31.

CAT initially responded to the Complaint by moving to dismiss for lack of personal jurisdiction. A32. Judge Koeltl denied that Motion. A33. CAT then answered the Complaint, denying infringement and claiming that the '652 and '222 patents were invalid and unenforceable. CAT also counterclaimed for infringement of U.S. Pat. No. 5,860,857 ("the 857 Patent") which CAT claimed to have licensed from a foreign concern known as "KIHU". KIHU was itself alleged to be a licensee of the owner of the '857 Patent, AGA AG ("AGA"). A33. Hypoxico denied infringement of the '857 Patent. A33. Subsequently, Hypoxico served an Amended Complaint and then a Second Amended Complaint A34, which, together

with CAT's Answer thereto and Hypoxico's Reply constitute the final pleadings herein.

The proceedings below were long and tortuous. CAT moved for a declaration that it could proceed in its own name for infringement of the '857 Patent, without joining AGA.  A35.  Judge Koeltl denied that Motion as well, A36, and CAT then proceeded to effect service on AGA and thereby join AGA to this action.  Since AGA was (and is) located in Sweden, service through the Hague Convention was required.  A36.

Judge Koeltl set the deadline for amending pleadings at October 25, 2004, and that date was never extended or re-set. A34.

In February 2005, while the Motion regarding AGA was pending, and after discovery was exchanged, CAT changed counsel, delaying the proceedings further. A35.  New counsel did not appear until May of 2005.  A36.

Lay discovery was set to end on June 2, 2006.  That date was never extended or re-set, although the Court did allow for some limited discovery later, as will be discussed.  A37.

Lay discovery proceeded and concluded. Then, in April 2007, the defendants changed counsel again.  A38.

On September 18, 2007, Hypoxico moved for summary judgment that its two patents were not proven invalid, were not proven unenforceable and were

infringed.  Hypoxico also moved for a declaration that it did not infringe the '857 Patent.  A39.  On September 4, 2008, Judge Koeltl granted-in-part and denied-in-part Hypoxico's Motion for Summary Judgment.  A41.  Specifically, the patents were found not proven invalid and most of the unenforceability claims were dismissed.  Those aspects of the motion relating to infringement were all dismissed.

On November 26, 2008, as the parties were preparing for trial, the case was re-assigned to Judge Griesa.  A43.  The first trial was held on January 12-29, 2009.  A44.

### E.    The first trial

#### a.    The claims at issue

Shortly before the trial, Hypoxico limited its claims against the defendants to infringement of claims 5 and 19 of the '652 Patent, and claim 3 of the '222 Patent.

#### i.    Claims 5 and 19 of the '652 Patent

Claim 5 of the '652 Patent depends from claim 4, which in turn depends from claim 1, and so the chain is as follows (A12):

1. A system for use in an external atmospheric environment of air at an external ambient air pressure and having an ambient oxygen concentration for providing a reduced-oxygen atmosphere to a user, said system comprising:

a gas separation device having an inlet intaking an intake gas mixture and first and second outlets, said first outlet transmitting a first gas mixture derived from said intake gas mixture and having a higher oxygen content than the intake gas mixture and said second outlet transmitting a second gas mixture derived from said intake gas mixture and having a lower oxygen content than the intake gas mixture;

a breathing chamber having an internal space therein containing air and including an entry communicating with said internal space and through which the user can enter said internal space;

said second outlet communicating with said internal space and transmitting said second mixture to said internal space so that said second mixture mixes with the air in the internal space;

said first outlet transmitting said first gas mixture to the external atmospheric environment; and

said breathing chamber permitting the communication of air in at least one direction between the external atmospheric environment and the internal space and in combination with the gas separation device, maintaining the air in the internal space at a pressure generally equalized with the ambient air pressure of the external atmospheric environment and at a substantially

constant concentration of oxygen substantially lower than said external ambient oxygen concentration.

4. The invention according to claim 1 and

said breathing chamber having vents therein, said vents providing for flow of air between said external atmospheric environment and said internal space.

5. The invention according to claim 4 and

said vents having apertures therein through which air can flow in either direction between said internal space and said external atmospheric environment.

Claim 19 of the '652 Patent depends from claim 11, and so the chain is as follows (A12-13):

11. A system for use in an external atmospheric environment of air at an external ambient air pressure for providing a low-oxygen environment for a user, said system comprising:

a chamber comprising a door and wall structure defining a closed space into which the user can enter through the door;

a gas processing device having an intake and first and second outlets, said device intaking a gas mixture through said intake and emitting a reduced oxygen gas mixture having a lower concentration of oxygen than

said gas mixture through said first outlet and emitting an enriched-oxygen gas mixture having a greater concentration of oxygen than said gas mixture through said second outlet;

said first outlet being connected with said chamber so that the reduced-oxygen gas mixture is emitted into said closed space inside the chamber and mixes with the air therein;

said chamber having apertures therein allowing communication there through of air in the outside environment with air in the chamber, said chamber and said gas processing device maintaining the air in the closed space at a pressure substantially equal to the external ambient air pressure and at a substantially constant oxygen concentration lower than the air outside the chamber;

said gas processing device comprising a separation unit to which the intake gas mixture from the inlet is transmitted, said separation unit separating the intake gas mixture into a reduced oxygen gas mixture with an oxygen concentration lower than said intake gas mixture and an enriched oxygen gas mixture with an oxygen concentration higher than said intake gas mixture, said separation unit having a reduced oxygen mixture conduit through which said reduced oxygen gas mixture is transmitted and an

enriched oxygen mixture conduit through which said enriched oxygen gas

mixture is transmitted;

said first outlet being operatively associated with said reduced oxygen

mixture conduit and receiving said reduced oxygen gas mixture therefrom,

said second outlet being operatively associated with said enriched oxygen

mixture conduit and receiving said enriched oxygen gas mixture therefrom

and releasing said enriched oxygen gas mixture to the external atmospheric

environment.

19. The invention according to claim 11 and said apertures providing

openings in said wall structure.

ii    *Claim 3 of the '222 Patent*

With respect to the '222 Patent, the only claim at issue was claim 3,

which depends from claim 1, and so the chain is as follows (A16-17):

1. A system for providing a reduced-oxygen atmosphere for breathing

to a user at rest, said system comprising:

an oxygen-extraction device having an inlet taking in ambient air and

an outlet for transmitting oxygen-depleted air;

a portable tent having internal space therein and an entry

communicating with said internal space and through which the user can

enter said internal space; said tent having collapsible supporting structure;

said outlet communicating with said internal space and transmitting said oxygen-depleted air to said internal space;

said internal space communicating with an external environment through naturally existing gaps and fabric pores, allowing excess air to escape said internal space and equalizing atmospheric pressure inside said tent to the outside parameter.

3. The system according to claim 1 and said hypoxic tent made of soft synthetic or natural material and supported by supporting structure, which is inflatable or assembled from segments made from metal, plastic or composite material.

b.    *Relevant Evidence*

i.    *Infringement*

Most importantly, the jury was able to view the actual accused product, a CAT 315 Tent in the hallway outside the courtroom.  A4658-65.

Viewing the actual CAT 315 Tent allowed the jurors to view its vents, apertures and see for themselves whether it could be disassembled in line with the other evidence adduced as described above.

ii.    *Lost profits*

Since the jury was able to view the accused product and Hypoxico's product, it could evaluate how simple they would be to manufacture, and allowed the jury to

see for itself the nature of the poles which held up the tents (simple PVC pipes), the nature of the tent (simple plastic sheeting, sewn together, and judge for themselves how difficult it would be for Hypoxico to purchase more of these commodities and assemble them into the tents and poles required for the tents. Hypoxico could have sold three times its then-current sales volume without incurring additional costs for overhead, salaries, *etc.* A1275. Hypoxico purchased the air separation units from a company called Sequal in California. A1023. CAT also uses Sequal air separation units. A1095. Thus, Hypoxico would have had available to it the same number of air separation units as CAT purchased, by simply buying more from its own supplier.

It is telling to note that CAT did not put on its own damages expert, and did not offer any evidence to rebut the above statements.

There was testimony that large sales would not have incurred additional marketing expenses, because, according to CAT's invoices, its customers paid the expenses for travel, *etc*. A1275. Again, CAT did not rebut this testimony.

    *c.*    *Jury Charge*

In the first trial, the issues of infringement presented to the jury were:

Whether each of the CAT products infringed the '652 and '222 patents;

If so, whether Mr. Kutt induced that infringement;

If either patent was infringed, was Hypoxico entitled to its lost profits;

If Hypoxico was not entitled to its lost profits, what was a reasonable royalty;

If there was infringement, was it willful;

Did Hypoxico infringe the '857 Patent; and

If so, what damages should be awarded to CAT.

For purposes of this appeal, the relevant jury charges and claim constructions are as follows:

#### i.    '652 Patent "Vents" and "apertures"

Definitions of "vents" and "apertures":  "a definition of vent having apertures is an opening such as a hole or other kind of an opening for the escape of a gas. That's what a vent is, an opening for the escape of a gas, and apertures can be a hole or other kind of opening."  A1669.

"The defendant contends that not all of its products have the the [sic.] vents or apertures talked about in Claim 5. I think they're particularly referring to the rooms."  A1670.

#### ii.    '652 Patent:  The final limitation of claim 1

"The defendant contends that none of its products infringe the 5th element of Claim 1."  A1670.

#### iii.    '222 Patent:  "Portable"

"'Portable' means easily transported or moved."  A1676.

24

### iv.    Inducement

"In order to show that an individual induced the infringement by a corporation, it must be shown that the individual knew or should have known that his personal activities, his actions would cause infringement. It is not just simply enough to show that he knew about the products. It must be shown that he knew or should have known -- in other words, he was careless in not knowing that his personal actions or activities would cause patent infringement." A1683.

### v.    Lost profits

"If a plaintiff can show that another party's products, sales of those products, production of those products infringed his patents, the plaintiff can then try to show that he lost profits as a result of that infringement. Obviously, that means showing that he would have made additional sales of his own products if the infringing products had not been in the marketplace.  He can't, of course, recover the gross sales price.  He can only recover the profits he would have earned. That's what are called, that is what is called lost profits. Now, lost profits aren't always very easy to prove for a variety of reasons." A1684.

"Would Hypoxico have been able to sell those products that were sold by CAT and what profits would have been earned." A1685

"So one question to consider is if you are dealing with a very large measure of all or a very large measure of CAT's products, if they hadn't been in the market

would Hypoxico had been able to make two and a half times as large sales as they made? And the factors about whether Hypoxico would have been able to do that have been discussed with you. What was the market? What was the relative marketing ability and sales ability of Hypoxico? They say they could have taken advantage of all that market and captured it. That's a question for you."

"The other side stoutly denies they had such ability and such marketing talent and ability. They deny that there was a market waiting that didn't need persuasive sales efforts and so forth and that Hypoxico didn't have that ability. Hypoxico says it did. But those are the kinds of things that 2 you've heard about and you'll consider.

"Now, the plaintiff has the burden of proof, not the burden of proof to produce something as certain as a computer run. You know something definite. Proving lost profits is difficult. And the law doesn't require the impossible but the burden of proof is still on the plaintiff to do something more than produce a speculative, purely, speculative kind of answer, of course, and that's what's meant by proving a case by a fair preponderance of the evidence. And I am really not going to give you any more definition. I don't think that would help you. You know the issues about lost profits and all I want to do is to indicate that you should concentrate on those issues that have been spelled out and I am not going to give you, repeat what has been said in quite complete form by the lawyers and through

the evidence. But what is important still to keep in mind is that there is a burden of proof and what you come up with just cannot be speculation." A1686-87.

### F.  Verdict and post-trial motions

The jury found that CAT's products infringed the asserted claims of the patents-in-suit, awarding Hypoxico its lost profits in the amount of $4,325,000, and found Mr. Kutt liable for inducement.   Last, the jury also found in favor of Hypoxico with respect to infringement of the '857 Patent.  A1712-18.  After the verdict, CAT moved for judgment as a matter of law with respect to infringement and the award of lost profits (A44), but the Court found that "the standard for this remedy has not been met" (A2074).  The Court did, however, find that, in its view, the CAT products operated in a different way, and so did not infringe either patent, and therefore granted a new trial on that issue, as well as on lost profits.  A2074-75.

With respect to the lost profits issue, the Court ruled that:

"The only evidence of damages offered by plaintiff, the testimony of Ilya Bykov, was deeply flawed and cannot reasonably form the basis of a damages award for lost profits. Bykov offered a calculation of the amount of profits lost by Hypoxico as a result of CAT's infringing activities. The analysis assumed that Hypoxico, a small operation that used minimal marketing efforts, had the manufacturing and marketing capacity to replicate all of the sales executed by

CAT, a company that appears to have been well run, highly professional, and motivated by sound business strategy. The analysis also assumed that all of the purchasers of CAT's products would have purchased Hypoxico's products instead. These assumptions were neither credible nor supported by evidence. Plaintiff therefore failed to make the showing necessary to demonstrate its entitlement to lost profits, since it did not demonstrate a reasonable probability that it could have made sales equal in quantity to the infringing sales, or that it had the manufacturing and marketing capability to exploit demand for that volume of sales." A2075-76.

CAT also moved for dismissal for lack of subject matter jurisdiction, namely a lack of a proper assignment. A44. The Court denied that motion, and ruled that the '222 Patent was not unenforceable. *Hypoxico Inc. v. Colo. Altitude Training*, 630 F. Supp. 2d 319 (S.D.N.Y. 2009).

After the verdict, Hypoxico moved for a Permanent Injunction, Pre-Judgment Interest and an accounting for sales occurring after the close of discovery, since those sales were not reflected in the verdict. A45. Those requests for relief were denied, in light of the Court's rulings on a new trial. A46.

As will be discussed below, Hypoxico seeks a re-instatement of the first jury's verdict.

### G.     Proceedings after the first trial and before the second trial

Shortly after the first trial, CAT's third set of counsel asked to be relieved, and Mr. Kutt applied to proceed *in forma pauperis* and have *pro bono* counsel appointed.  A46.  Judge Griesa granted both requests, and a fourth set of counsel appeared for the defendants.  A46.

In May of 2010, CAT filed for bankruptcy.  A47.  The automatic stay was ultimately lifted and the case below was allowed to proceed.  The Court below permitted further discovery to supplement the discovery which had closed in 2006, and to have further expert reports and expert discovery.

A second trial was set for January 30, 2012.

On December 11, 2011, just a few weeks before the second trial, CAT's (third) new counsel (CAT's fourth trial counsel overall) served an expert report from its (new) damages experts.  The new expert asserted, for the first time, that certain of CAT's sales were exempt from a damages claim pursuant to 28 U.S.C. § 1498(a).  A2100-01.  No motion to amend the pleadings to claim this affirmative defense was made, and no discovery was possible to investigate the claim of the availability of § 1498(a), coming as it did so close to trial.  Hypoxico moved, *in limine*, to exclude this late-arriving affirmative defense (A48), and the Court denied that motion (A56).

CAT's new counsel had changed its non-infringement arguments, and so Hypoxico moved for a *Markman* ruling in advance of trial, to determine the appropriate claim constructions. A48. The Court denied that motion, without briefing by CAT, on the grounds of alleged untimeliness, leaving the issue of claim construction to the trial itself. A48.

### H.     The second trial

A second jury trial was held January 30-February 10, 2012. A50.

#### a.     Rulings during trial

During the second trial, Judge Griesa ruled that Hypoxico had failed to make out a case for lost profits, and would be restricted to a claim for a reasonable royalty. A2850. He gave Hypoxico the right to request the opportunity to prove lost profits, but, when Hypoxico made that application, he denied the request. A2993.

Judge Griesa further ruled, before the case went to the jury, that Mr.Kutt was not proven liable for inducement. A3133. The stated reason for ruling in favor of Mr. Kutt was that he had testified he had received an opinion of counsel that he was not infringing, and Judge Griesa "[did not] question the veracity of Mr. Kutt's testimony." A3133. It had been pointed out to the Court that Mr. Kutt had not produced a written opinion, and there was no evidence that the opinion was provided to Mr. Kutt after any of the current products were sold, or even after they

had been conceived.  A3132.  Nonetheless, the Court decided that it would accept unquestioningly Mr. Kutt's unsupported, unverified, self-serving testimony, and that (by inference) no reasonable juror could do otherwise.

During the second trial, Judge Griesa revised, *sua sponte*, his claim constructions from the first trial, without briefing from either side (other than the pre-trial Memorandum offered by Hypoxico -- A2080-96).

During the second trial, Judge Griesa also raised, *sua sponte*, a question as to the validity of the '222 Patent, A3133, even though Judge Koeltl had ruled it had not been proved invalid.

### b.    Claim constructions

#### i.    "Vents" and "apertures"

Judge Griesa construed the claim terms "vents" and "apertures" in the '652 Patent so as exclude "incidental openings", *i.e.*, those terms required the presence of openings that were intentionally added to a structure to provide ventilation. A3104.  That therefore excluded all CAT Room Systems from the ambit of the '652 Patent, since all openings in the enclosures thereof were not added, but were simply pre-existing openings that were not closed by CAT.

With respect to the Tent Systems, such as seen by the jury, he defined "apertures" as follows:

"You recall that there are, in the CAT tent products, zippers at the top of the walls which can be opened and closed. There are zippers at the bottom which can be opened and closed, but the evidence is undisputed that the primary purpose of those zippers is to allow the installation of an air conditioning unit. But there are jury questions about those zippers which will be submitted to you, and there will be essentially the issue, do those zippers, which can be opened or closed, do they infringe the Claim 5 of the '652 patent and/or Claim 19 of the '652 patent." A3173.

"Zippers in the walls of a tent may be 'vents having apertures' within the meaning of Claim 5 of the '652 patent and may be 'apertures providing openings in the wall structure' within the meaning of Claim 19 of the '652 patent. This does not apply to zippers which contain air conditioning units, but this applies to zippers which may allow for the insertion of air conditioning units but where such units are not inserted, so that the zippers can simply be opened and closed. Although, as stated, such zippers, to the extent that they can be opened and closed, may be vents and/or apertures, they are actually covered by these terms as used in Claim 5 and Claim 19 – I think I said 11. It should be 19. So if you just change that. Let me start that sentence again.

"Although, as stated, such zippers may be vents and/or apertures, they are actually covered by these terms as used in Claim 5 and Claim 19, only if they perform certain functions and avoid certain functions or results. They must assist in the carrying out of the basic function described for the patented device or devices as a whole -- that is, the maintaining of the air in the internal space or the closed space at a substantially constant concentration of oxygen substantially lower than the outside air. However, a zipper can be a vent and/or aperture within the meaning of the patent if it also provides general ventilation.

But, in order to come within the meaning of the patent, the zippers and the operation of the zippers must not detract from the basic function of maintaining a substantially constant concentration of oxygen. Claims 5 and 19 with their references to vents and/or apertures do not amend the basic requirement of maintaining a substantially constant concentration of oxygen nor do the references as to such vents and/or such apertures indicate that the requirement of such maintenance is detracted from or reduced. Thus, if the zippers

32

are covered by the references to vents and/or apertures in Claims 5 and 19, they cannot be susceptible of operation in a way that interferes with the basic requirement of maintaining a constant concentration of oxygen in the chamber." A3173-74.

> ii    *"Portable"*

Judge Griesa construed "portable" differently at the second trial than he did at the first trial.  Specifically, he defined the term "portable" as follows:

> "The tent, according to the patent, must be portable.  For claim construction, the court refers to the specification in the '222 patent, which states:

> "The invention presented here provides a convenient, low cost solution to create such an environment for sleeping.  This invention makes it possible to make a portable version of the hypoxic room system, convenient for athletes while traveling, and may be easily installed at home or in any hotel room.

> "The court also refers to this further language in the specification: Hypoxic tent systems can be easily disassembled and packed in luggage." A3174.

The Court provided no basis for the construction, or why it differed so markedly from the construction offered to the jury at the first trial.

One of the contested issues during the second trial was whether CAT's controlled systems operated in a fashion that was greatly different from that of the claimed invention to meet the claim limitation of maintaining the oxygen concentration within the enclosure, with both parties putting on evidence in support of their positions.  Hypoxico contended, that insofar as the operation of the controller affected the output of the air separation unit A5607, it did not change the

fact that it was the air separation unit that controls and maintains the environment within the enclosure. Hypoxico offered expert testimony on the amount of difference it would make, while CAT offered no such evidence. Judge Griesa ruled that he believed CAT's evidence because one of the units had been purchased on behalf of one of the Koch brothers. "It is difficult for me to believe that Mr. Koch and his staff would be buying a nullity, a worthless piece of machinery and so forth. There is no basis for such a finding. There is no basis for a jury to find such a thing." A3131.

At the second trial, CAT did not contest that the 150 Tent infringed the '222 Patent. A3173.

## I.    Second verdict and subsequent proceedings

The jury was left with a decision of whether the uncontrolled tent systems infringed the '652 Patent and whether the 315, 430 and 535 Tent Systems infringed the '222 Patent. If they were found to infringe, the jury was directed to find what a reasonable royalty would be.

In response to CAT's trial motion for JMOL, Judge Griesa said: "Under no circumstances would I say that I should construe the patent to say whether the 315 model is portable or not. I think this will be a jury question" A3040.

The jury found that the products did infringe and awarded Hypoxico $1,000,000 as damages, and that a reasonable royalty would be 15%. A50.

34

After the verdict, Hypoxico moved for a Permanent Injunction, an accounting for Uncompensated Infringing sales, and pre-judgment interest. A51. CAT, in turn, moved for JMOL or, in the alternative, a new trial or remittitur. A54.

The Court denied Hypoxico's motion and granted CAT's motion for JMOL, ruling that only the 150 Tent infringed the '222 Patent, and found that no reasonable juror could find that the 315 Tent was "portable". A57. The Court also directed that a third trial on the issue of a reasonable royalty for the '222 Patent be held. While the parties were attempting to negotiate a stipulation in lieu of the third trial, CAT moved for a stay of further proceedings pending the results of two re-examinations filed in the United States Patent and Trademark Office ("PTO") with respect to the patents-in-suit. A57. Hypoxico cross-moved for entry of a final judgment pursuant to 28 U.S.C. § 1292(c)(2). A57. While these motions were pending, the PTO confirmed the patentability of all relevant claims (all claims of the '652 Patent and the sole asserted claim of the '222 Patent, *inter alia*. This mooted the stay motion, and the Court denied the motion for a final judgment pursuant to 28 U.S.C. § 1292(c)(2). A58.

On May 20, 2014, to avoid a third trial and proceed with the instant appeal, the parties entered into a Stipulation agreeing to a measure of damages for CAT's sales of the 150 Tent and dismissing all other claims without prejudice to the filing

35

of this appeal and cross-appeal.  A58.  The Court entered the agreed-upon final judgment on May 21, 2014.  A58.

Hypoxico filed its Notice of Appeal herein on June 11, 2014.  A58.  CAT filed its cross-appeal on June 24, 2014.

## V.    SUMMARY OF THE ARGUMENT

The right to trial by jury is a foundational principle of the American justice system.  That right cannot, and must not, be subverted by a District Judge throwing out not one, but *two*, jury verdicts because he takes a different view of the evidence.  Evaluating witness' credibility and weighing evidence are quintessential jury questions to be left in the hands of "twelve people good and true".  In evaluating motions for a new trial and/or JMOL, a District Court must consider *all* evidence in the trial, and give credence to all reasonable inferences which the jury was entitled to draw from the evidence in favor of the prevailing party.  It is the exclusive province of the jury to weigh conflicting evidence, and give credence to one witness over another, or one piece of evidence over another.  A judge may not simply substitute his judgment for that of the jury, and ignore evidence that he finds less than compelling, where a jury is free to disagree.

In making a *Markman* ruling, a trial judge may not construe a claim term other than by its "ordinary meaning" absent some teaching in the specification or prosecution history that the term should be so construed.  A Court may not read

36

limitations from the specification into the claim absent some teaching in the specification that this is the proper meaning to be accorded the claim term by one of ordinary skill in the art at the time of the invention.

In a jury trial, a judge cannot rule "as a matter of law" in favor of a party because he credits that party's witness' testimony, when a jury has the right to discredit that same testimony. The judge cannot take that issue of fact away from a jury.

In a patent jury trial, where witnesses provide conflicting testimony a judge cannot rule "as a matter of law" that there is "no basis" for a jury to find that a product sold by the defendants must operate as the defendants state because it was purchased by one of the Koch brothers.

Whether a particular sale of a defendant's product is exempt from recovery under 28 U.S.C. § 1498(a) is an affirmative defense which must be pleaded and proven, and cannot be raised for the first time in a rebuttal damages expert report served years after discovery closed and a few weeks before trial.

## VI.    ARGUMENT

The right to a trial by jury is a bedrock principle of American jurisprudence, enshrined by the Founding Fathers in the Bill of Rights. The Seventh Amendment provides:

> In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and

no fact tried by a jury, shall be otherwise reexamined in any court of
the United States, than according to the rules of the common law.

The standards for overturning a jury verdict, therefore, are necessarily high,
to preserve a litigant's constitutionally guaranteed right to have his case decided by
a jury of his peers.  CAT cannot, and did not, meet those standards, as both
verdicts were amply supported by the evidence.

This Court reviews decisions on motions for JMOL, motions for a new trial,
and evidentiary rulings under the law of the regional circuit.  *InTouch Techs., Inc.
v. VGo Communs., Inc.*, 751 F.3d 1327, 1338 (Fed. Cir. 2014).  Here that is the
Second Circuit.

Claim construction, of course, is a matter unique to patent law, and so this
Court relies upon its own precedent.

### A.    Standard of Review – New Trial

The Second Circuit "reviews the grant of a new trial on the ground that the
verdict was against the weight of the evidence for abuse of discretion."
*Amorgianos v. Amtrak*, 303 F.3d 256, 261 (2d Cir. N.Y. 2002)

### B.    Standard for the grant of a New Trial

A new trial should only be granted pursuant to Fed. R. Civ. P. 59 where the
jury verdict is "egregious".  *DLC Management Corp. v. Town of Hyde Park*, 163
F.3d 124, 134 (2d Cir. 1998), *cert. denied*, 510 U.S. 908 (1993).  A trial judge's

disagreement with the jury's verdict is by itself insufficient to grant a new trial. *See*, *Saloomey v. Jeppesen & Co.*, 707 F.2d 671, 679 (2d Cir. 1983).

Here, the Court granted CAT a new trial after the first jury verdict, the new trial being granted both as to liability and damages.  A2074.  This was clearly erroneous and an abuse of discretion.

### a.    New Trial – Infringement

The Court found that "The evidence did not show that CAT's controlled systems operate in the manner specified by the asserted claims."  A2074.  More specifically, the Court found that the controlled systems did not operate as required by the claims, in that the oxygen concentration in the controlled systems was not maintained as substantially constant.  The evidence adduced at trial, however, was that the CAT controlled systems did not operate significantly differently from the uncontrolled systems, in that they both maintained the simulated altitude at a substantially constant level.  The Court recognized this.  A2069.  However, the Court failed to take into account the legal principle that merely adding a component to an otherwise infringing device does not avoid infringement.  *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984)

Mr. Kutt testified that his patent described the way the Colorado Mountain Room, a controlled system, operates in the "real world" (A1479) and that his

patent shows that the oxygen concentration inside a controlled enclosure is predicted to stay substantially constant over time (A1480);

The only function of the controller in CAT's controlled systems -- and this is critical -- is to adjust the oxygen concentration of the hypoxic air generated by the gas separation device (A1221) *i.e.*, even when a controller is used, it is still the gas separation device that generates the hypoxic air that is then pumped into the enclosure for maintaining a substantially constant oxygen concentration in the enclosure. While Mr. Kutt attempted to persuade the jury that the changes in oxygen concentration would be great, Hypoxico's technical expert, Dr. Rhodes, testified that any fluctuation in the oxygen concentration of the air being input to the enclosure is in fact very small (A1527-29).[2]

As the foregoing evidence demonstrates, in CAT's controlled systems the oxygen concentration in the enclosure is maintained substantially constant by the enclosure itself, which separates air inside the enclosure from the outside air, together with the gas separation device, which is the only component of the system that can change the oxygen concentration of the air inside the enclosure. The sole function of the controller is to adjust the output of the gas separation device, but it is still the hypoxic output of the gas separation device that maintains a

---

[2] CAT also called a technical expert at trial, Dr. James Ritter, who testified how certain of CAT's systems worked, but Dr. Ritter did *not* offer an opinion as to CAT's controlled systems or why they do not infringe Hypoxico's patents.

*substantially constant* oxygen concentration in the enclosure, just as the patent claims require.

The law is clear that if a device meets all of a claim's limitations, but simply adds something else, it still infringes. *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984). ("[O]ne cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device."). Thus, the issue is not whether CAT may have added some additional feature to its systems, but whether CAT's controlled systems meet all of the elements in at least one of Hypoxico's asserted patent claims.

The Court seemed to believe that the fact that the controller controls the air separation unit, means that it is the controller, *and not the air separation unit*, which controls the environment within the enclosure. A2075. This is wrong, as shown by all of the evidence, which shows that the air separation unit performs the same function in both controlled and uncontrolled systems.

The Court also held that the controlled systems do not infringe, because the controllers cause the oxygen concentration within the enclosure to vary, but that is not prohibited by the claims which call only for a "substantially constant" oxygen concentration. Dr. Rhodes testified that the fluctuations were, at most no more than ± 1%. A1529. It is particularly telling that CAT, throughout both trials, and

two separate expert witnesses, never attempted to quantify the alleged change in oxygen concentration caused by the controllers. The jury was entitled to credit the uncontradicted testimony of Dr. Rhodes, a world renowned expert in thermodynamics, when he explained that environmental changes in air pressure due to atmospheric conditions are always quite small and gradual. This is especially true where CAT offered no contradictory evidence.

As the Court acknowledged in its charge to the jury, whether or not CAT's controlled systems meet all of the limitations of Hypoxico's asserted claims was an issue of fact for the jury. (A1668 – "Now, that's all I want to say about that 5th element of claim 1. I want to make it very, very clear to you again, and I may say it even more, that what I'm trying to do is to illustrate to you the issues, and ***how you find or decide as to those issues is up to you and not up to me. I'm not trying to signal you what you should do.***" – emphasis supplied). The jury found that CAT's controlled systems meet the limitations of the claims, and that finding should not be disturbed.

The undisputed evidence at trial was that each CAT controlled system has an enclosure for people or animals; indeed, a hypoxic system couldn't function without one, as it is the enclosure which prevents the dissipation of the hypoxic air in the enclosure to the external atmosphere. It is likewise undisputed that the only component of CAT's systems (controlled or uncontrolled) that adjusts the oxygen

42

concentration in the enclosure is the gas processing device; nothing else introduces hypoxic air into the enclosure. In CAT's controlled systems, the controller adjusts the hypoxic output of the gas separation device (A1220-21), but it is still the gas separation device that introduces the hypoxic air into the enclosure and, together with the enclosure, maintains the oxygen concentration in the enclosure substantially constant.

In *Carl Zeiss Stiftung v. Renishaw PLC*, 945 F.2d 1173 (Fed. Cir. 1991) the claims were directed to coordinate measuring machines ("CMMs") used for measuring the shape of an object. The CMMs operated by moving a stylus in three-dimensional space, until the stylus contacted the object being analyzed, the point of contact indicating one point in three-dimensional space where a surface of the object existed. By moving the stylus towards and away from the object in varying directions and orientations, a sufficient number of points could be gathered for input to a computer which then determined the shape of the object.

The claim at issue required "means for providing [a] signal when [a] movable member is removed from its rest position." *Id.* at 1177. This feature served to generate a signal precisely at the point where the stylus touched the object's surface to ensure the accuracy of the spatial measurement. The accused product generated the positioning signal through use of a highly sensitive piezoelectric crystal that was confirmed through a secondary signal generated

43

when the movable member was removed from its rest position.  The trial court found that this was a non-infringing way of performing the measurement. The Federal Circuit reversed.  The Federal Circuit found that providing the signal when the movable member was removed from its rest position was all that was required, and that adding a further element, *i.e.*, the piezoelectric crystal to refine the system, did not avoid infringement. *Id.* at 1179.

Likewise here, CAT's controller simply adds a feature that regulates the output of the gas separation device more closely, but it is still the gas separation device in combination with the enclosure that maintains a substantially constant oxygen concentration in the enclosure, just as claims 5 and 19 of Hypoxico's '652 patent require.

Thus, the grant of a new trial on infringement was erroneous and should be reversed, with the jury verdict re-instated.  This is especially true with respect to the issue of infringement by uncontrolled systems, since the Court found no fault in the finding of infringement with respect to these systems, finding only that it would be "artificial" to give voice to a jury whose verdict was correct.  A2075.

### b.    New Trial – Lost Profits

#### i.    New Trial – Lost Profits – Standard for review

"Whether lost profits are legally compensable in a particular situation is a question of law that we review de novo." *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011).

#### ii.    Lost Profits - Entitlement

The Court disagreed with the jury's finding that Hypoxico had proven itself entitled to its lost profits, finding fault with Hypoxico's proofs that it could have made all of CAT's sales. A2075. The trial evidence supported such an award.

The Court made a factual finding at odds with respect to the jury's determination that Hypoxico had proven it would have made all of CAT's sales. The evidence supporting this holding is set our above, namely that the uncontradicted evidence showed that Hypoxico could easily have made the sales. The Court found that CAT was "a company that appears to have been well run, highly professional, and motivated by sound business strategy." A2075. It is unclear on what basis the Court made this finding, no citation to the record was made, since CAT declared bankruptcy a little more than a year after the verdict, and its books (uncovered at the second trial) showed it had been losing money every year, but one, and had lost nearly $3 million from 2002-09. A5704.

### c.    New Trial – Inducement

The jury charge with respect to inducement is in line with relevant precedent, and was delivered without objection by CAT.  Hypoxico presented evidence that Mr. Kutt knew of the patents, and by his attempted concealment of the nature of the products CAT would be selling evidenced a guilty mind. ("Because Mentor presented evidence that Misonix knew or should have known that its products would be used in the patented method, we conclude that the district court abused its discretion in granting a new trial to Misonix on this issue." *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1379 (Fed. Cir. 2001)

Hypoxico therefore provided the jury with circumstantial evidence of Mr. Kutt's intent, especially since his testimony regarding a supposed opinion of counsel was so suspect.

### C.    Standard of Review – JMOL (Second Trial)

The Second Circuit "review[s] de novo a district court's decision to grant a Rule 50 motion for judgment as a matter of law" *Cash v. County of Erie*, 654 F.3d 324, 332 (2d Cir. N.Y. 2011)

D.    **Standard for JMOL**

    a.    *Standard for Overturning a Jury Verdict as a Matter of Law.*

The Second Circuit has been clear and emphatic about the strenuous burden

that must be carried by a party moving for JMOL under Rule 50

> "[The] standard [for granting JMOL] generally imposes a heavy
> burden on a movant, who will be awarded judgment as a matter of law
> only when a party has been fully heard on an issue during a jury trial
> and the court finds that a reasonable jury would not have a legally
> sufficient evidentiary basis to find for the party on that issue. Fed. R.
> Civ. P. 50(a)(1); …. That ***burden is particularly heavy where, as
> here, the jury has deliberated in the case and actually returned its
> verdict in favor of the non-movant***. … In such circumstances, a court
> may set aside the verdict only if there exists such a complete absence
> of evidence supporting the verdict that the jury's findings could only
> have been the result of sheer surmise and conjecture, or the evidence
> in favor of the movant is so overwhelming that reasonable and fair
> minded persons could not arrive at a verdict against it.… In short, ***a
> Rule 50 motion may be granted only if the court, viewing the
> evidence in the light most favorable to the non-movant, concludes
> that a reasonable juror would have been compelled to accept the
> view of the moving party.***" *Cash v. County of Erie*, 654 F.3d 324, 333
> (2d Cir. N.Y. 2011) (emphasis supplied; internal citations and
> quotation marks omitted)

In deciding whether to grant JMOL, a court may not consider the credibility

of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence.

*Williams v. County of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999).  Those issues

are the jury's inviolable purview.

    The Supreme Court has spoken clearly and concisely on the need to accept a

jury's fact findings as final.  In *Tennant v. Peoria & Pakin Union Ry. Co.*, 321 U.S.

29 (1944), a railway switchman was killed by a train. There was no direct evidence as to his precise location at the moment he was killed. Accordingly, plaintiff's theory of liability, that the engineer backed the train over the decedent without first ringing the engine bell, depended upon an inference of causation to be drawn from the available evidence. The jury drew that inference in the plaintiff's favor and returned a verdict against the defendant railroad. On appeal, the Seventh Circuit held that the trial court should have entered a verdict in the railroad's favor. The Supreme Court reversed and reinstated the jury verdict:

> It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. That conclusion, whether it relates to negligence, causation, or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable. 321 U.S. at 35 (citations omitted).

If the evidence adduced at trial would allow a rational jury to draw a particular inference in a party's favor, "[n]o court is then justified in substituting its conclusions for those of the … jurors." *Id.* at 33. Stated another way, "[t]he court is not permitted to find as a fact a proposition that is contrary to a finding made by the jury." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

48

   *b.*  *There is substantial evidence that CAT's "controlled" systems infringe.*

Substantial evidence at trial showed that CAT's controlled systems infringe. CAT argues that "the uncontradicted evidence at trial disclosed [that] these controlled systems . . . operate in a dramatically different way than small, uncontrolled tents." (JMOL Memorandum, p. 5).  But CAT cites not one piece of trial evidence to support that statement.  Not a single word of trial testimony; not a single trial exhibit.  Regardless, the uncontroverted evidence was that CAT's systems with controllers include all of the elements of one or more of Hypoxico's patent claims and therefore infringe.

CAT asserts that, in controlled systems, the oxygen concentration in the enclosure is not "maintained" at a "substantially constant" level by the enclosure and the gas separation device as required by asserted claims 5 and 19 of the '652 Patent.  Taking the evidence in the light most favorable to Hypoxico, and drawing all reasonable inferences in Hypoxico's favor, as the Court must on a JMOL, the following evidence amply supports the jury's verdict.

Every CAT system, controlled or uncontrolled, has a gas separation device that introduces hypoxic air, *i.e.*, low-oxygen content air, into the enclosure (A4598-4611);

CAT's website (A4114) refers to "How CAT Systems Work" without regard to whether the systems are controlled or uncontrolled, and it is uncontested that in

the uncontrolled systems the oxygen concentration in the enclosure is maintained substantially constant by the gas separation device and the enclosure;

The CAT controller simply controls the air separation device, and so the air separation device is the mechanism for controlling the oxygen concentration. (A5607).

The jury's verdict must stand if there is substantial evidence to support it. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000); *U.S. v. Space Hunters, Inc.*, 429 F.3d 416, 429 (2d Cir. 2005). And, as shown above, there is more than substantial evidence to support the jury's verdict.

### c.    The JMOL Decision

In its ruling regarding JMOL after the second trial, the Court stated that the sole issue it needed to address was whether the zippers in CAT's Tent Systems constituted vents or apertures within the meaning of the '652 Patent, and found, as a matter of law, that they did not.

Initially, the Court advised the jury that it was their duty to make this finding. A3173. When the jury disagreed with the Court's view of the evidence, the Court threw out the jury's verdict.

### E.    Standard of Review – Claim Construction

Claim construction is reviewed de novo. *Butamax(TM) Advanced Biofuels LLC v. Gevo*, Inc., 746 F.3d 1302, 1307 (Fed. Cir. 2014).

### F.    Claim construction

Claim terms are given their ordinary meaning to one of skill in the art, unless the patent documents show that the patentee departed from that meaning. *Lighting Ballast Control LLC v. Philips Elecs. North Am. Corp.*, 744 F.3d 1272, 1289 (Fed. Cir. 2014).

"There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Prosecution disclaimer or disavowal must be clear and unmistakable. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). "In the absence of an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning. We indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 857 (Fed. Cir. 2014) quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (internal citations omitted)).

Claims must be interpreted in light of the specification and in light of the file history, if in evidence, but it is improper to read limitations from the specification into the claims. ("While we read claims in view of the specification, of which they

are a part, we do not read limitations from the embodiments in the specification into the claims.")  *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367 (Fed. Cir. 2014)

Here, the file history of the '652 patent was not in evidence in either trial. The specification of the '222 patent was in evidence only in the first trial.   In neither trial, however, did the Court refer to the file history of either patent for its claim constructions.   Thus, the only basis for deviating from the general rule of construing a word in accordance with its ordinary meaning would be the specification.   In neither specification, however, did the patentee provide any explicit definition of the term "vents", "apertures" or "portable".   Furthermore, the Court, in reaching its conclusion as to the definition of "portable" ***expressly*** read portions of the specification as part of the definition, even though the portions of the specification did not support such an interpretation.

Thus, the issue here is how would one of ordinary skill in the art at the time of the invention understand the claim terms based upon reading the specifications, including how claim terms which are ordinary words are understood.

        *a.*     *"Portable"*

What, then, is the ordinary meaning of "portable"?   According to one dictionary A2096, it means "capable of being transported or staged".   That

comports with the construction the Court gave to the term at the first trial: "'Portable' means easily transported or moved." A1676.

One aspect of the term "portable" is that, by its nature (ending in "-able"), it refers to the state of being capable of something, here, being moved. It does not require that the item (here, a tent) actually be moved, merely that it be *capable* of being moved. Thus, the Court erred by requiring proof that the tents be proven to have been moved A3444, rather than simply showing that they had the *capability* of being moved. Even though Hypoxico introduced evidence that one system had been moved, to a hotel room no less (A5733-35), the Court dismissed that evidence as being to only *one* instance of moving the tent (A3445). A device meets a limitation so long as it is capable of performing the function, without proof that it is actually ever operated so as to do so. ("[T]o infringe a claim that recites capability and not actual operation, an accused device need only be capable of operating in the described mode." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) (internal quotations omitted).

The Court also erred by finding that the *systems* accused of infringement (the 315, 430 and 535 Tent Systems) were not portable, and included in that finding was a discussion of the weight and bulk of the air separation unit making up a part of the systems. However, the claim term clearly states that it is the *tent* which must be portable, not the air separation unit (a separate component of the

system), and so the Court's consistent reference to the portability of the various systems (A3445) was error.    ("such sales [of air generators in travel cases], whenever they have occurred, provide no real evidence regarding the portability of the <u>entire system</u>.") (emphasis in original).

The evidence introduced, as described above, is that the 315 **tent** weighs 24 pounds, the 430 **tent** weighs 25 pounds and the 535 **tent** a little bit more. A3438-39.  These **tents** are certainly light enough to fit into a bag or be otherwise carried, and so would qualify under any definition of "portable".

> b.    *"Vents" and "apertures"*

The ordinary meaning of "vents" and "apertures" are simply "holes" or "openings", as the Court determined at the first trial (A1669), and as confirmed by the dictionary definition of "apertures" (A2096).  There is no basis for importing further limitations into the definitions, such as requiring that the "vents" or "apertures" be intentionally placed.  Neither term is defined in the specification, and so there is no basis in the patents themselves to deviate from their commonly accepted meanings.

## G.    The Court's JMOL grant based on weighing evidence

As mentioned earlier, the Court granted JMOL to Mr. Kutt based upon the Court's belief in his veracity.  A3133, and granted JMOL regarding the operation

of the controllers by finding that people working for one of the Koch brothers wouldn't buy something that did not work as advertised.  A3131.

In each case, the Court reached a factual determination by determining that certain witnesses were credible, even ones, like the unnamed staff of the Koch brother, who did not testify in Court.  It is not proper for a judge to grant JMOL based on his or her evaluation of a witness' credibility, where the jury would be free to find otherwise.  Not only is this improper, it is completely backwards, because the Court must make all credibility determinations in favor of the nonmoving party, not in favor of the moving party.  ("If, drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in [her] favor, there is sufficient evidence to permit a rational juror to find in [her] favor, we must overturn the directed verdict or [JMOL].")  *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 167-168 (2d Cir. N.Y. 2003)

Thus, here, the JMOL must be overturned, because the jury was free to find that Mr. Kutt was not trustworthy, and could question his veracity, and could also find that Dr. Rhodes, a Ph.D. in thermodynamics who was present in Court, was more credible than an unnamed employee of one of the Koch brothers, who never even said that they believed that the controller worked as advertised.

### H.    Hypoxico's Motion *in Limine* – 28 U.S.C. § 1498(a)

####     a.    *Standard of Review – Limine motion --§ 1498(a)*

"We review a district court's evidentiary rulings for abuse of discretion, and will reverse only if an erroneous ruling affected a party's substantial rights." *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. N.Y. 2005)

####     b.    *Argument – § 1498(a)*

Here, the Court allowed CAT to argue the applicability of 28 U.S.C. § 1498(a), even though

When raised between private parties, reliance on § 1498(a) is an affirmative defense. *Advanced Software Design Corp. v. FRB of St. Louis*, 583 F.3d 1371, 1375 (Fed. Cir. 2009). Failure to plead an affirmative defense acts as a waiver of that defense. *Curry v. City of Syracuse*, 316 F.3d 324, 330-331 (2d Cir. N.Y. 2003). Here, CAT waited nine years after the filing of the Complaint, five years after the close of discovery, months after the service of Hypoxico's opening expert report and just a matter of weeks before the ***second*** trial in this case. There is no basis to permit CAT to rely on § 1498(a) at this juncture. Hypoxico would be significantly prejudiced, by not being allowed to take discovery to determine the applicability of § 1498(a) to any specific sales made by CAT, and CAT should not be permitted to claim the benefit of § 1498(a) without any evidentiary showing that the products in question qualify.

## VII.    CONCLUSION

For the reasons stated, Hypoxico initially requests that the Court reverse the New Trial Order and re-instate the first jury verdict in its entirety, plus interest and costs.  Should the Court do so, Hypoxico further asks that the case be remanded to the District Court for an accounting of all infringing sales after the last day for which the first jury awarded damages (December 31, 2008), with a direction that the District Court calculate such damages based on the jury's finding that Hypoxico is entitled to its lost profits for all of CAT's sales, together with pre-judgment interest and costs.  Hypoxico further requests that the Court direct the District Court to enjoin CAT and Mr. Kutt, and all others acting in concert with either or both of them, from further infringement of the patents-in-suit.

Alternatively, should the Court not re-instate the first jury verdict, Hypoxico requests that the Court re-instate the second jury verdict of infringement, and remand for a calculation of damages, based on Hypoxico's lost profits, that the Court vacate the Order finding Mr. Kutt was not liable for inducing CAT's infringement of Hypoxico's patents and allow Hypoxico to pursue claims of infringement for those products excluded by Judge Griesa.

Respectfully submitted on this 11th day of September.

/s/ Roger S. Thompson
Roger S. Thompson (RT 2117)
THE LAW OFFICES OF ROGER S. THOMPSON
116 Pinehurst Avenue, Suite D-14
New York, New York 10033
Phone:  (212) 923-5145
Fax:  (866) 276-8409
roger@thompson-ip.com

*Counsel for Appellant*

# **ADDENDUM**

# ADDENDUM

## TABLE OF CONTENTS

**PAGE:**

Final Judgment
     filed May 21, 2014...................................................................................Add. 1

U.S. Patent 5,799,652
     dated September 1, 1998 ......................................................................Add. 3

U.S. Patent 5,964,222
     dated October 12, 1999.......................................................................Add. 14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------X

HYPOXICO INC.,                                          :

        Plaintiff/Cross-Defendant/Counter-Defendant/Counter-   :
                Claimant

                                                        :

        vs.                                             :        Civil Action No.

                                                        :
COLORADO ALTITUDE TRAINING LLC,                                 02 Civ. 6191 (TPG)

                                        :

        Defendant/Cross-Claimant/Counter-Claimant       :

----------------------------------------------------------------X
```

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 5/21/2014

## ~~[PROPOSED]~~ FINAL JUDGMENT

For the reasons stated in the August 28, 2012 order (Docket No. 242) (the "JMOL Order"), all prior proceedings and orders herein and the attached Stipulation, IT IS ORDERED AND ADJUDGED that:

      1.     Judgment be and hereby is entered in favor of Hypoxico Inc. ("Hypoxico") and against Colorado Altitude Training LLC ("CAT") as follows:

      (a)     CAT's 150 Tent Systems literally infringe Claim 3 of U.S. Patent No. 5,964,222 (the "'222 Patent");

      (b)     Hypoxico is awarded $111,900 in damages, plus post-judgment interest, from CAT for the infringement of claim 3 of the '222 Patent;

      2.     Judgment be and hereby is entered in favor of CAT and against Hypoxico as follows:

      (a)     CAT's "controlled systems," as defined in footnote 1 of the JMOL

Order, do not infringe the '222 Patent or the asserted claims of U.S. Patent No. 5,799,652 (the "'652 Patent");

(b)     CAT's 150, 315, 430, and 535 Tent Systems do not infringe the asserted claims of the '652 Patent;

(c)     CAT's 315, 430, and 535 Tent Systems do not infringe the asserted claim of the '222 Patent;

(d)     Hypoxico's claim for lost profits is dismissed; and

(e)     Hypoxico's request for a permanent injunction respecting further infringement by way of sales of CAT's 150 Tent Systems is dismissed.

3.     All other claims, counterclaims, cross-claims, third-party claims, defenses and affirmative defenses are hereby dismissed.

4.     Hypoxico is awarded its costs in this action to the extent permitted by law and in an amount to be determined upon Hypoxico's application for costs; and

5.     Each party shall bear its own attorneys' fees.

_____

United States District Judge

Dated: 5/20, 2014

_____

(By) Deputy Clerk

6601864v.1

**Add. 2**

US005799652A

# United States Patent [19]

## Kotliar

| [11] | Patent Number: | 5,799,652 |
|---|---|---|
| [45] | Date of Patent: | Sep. 1, 1998 |

[54] **HYPOXIC ROOM SYSTEM AND EQUIPMENT FOR HYPOXIC TRAINING AND THERAPY AT STANDARD ATMOSPHERIC PRESSURE**

[75] Inventor: **Igor K. Kotliar**, New York, N.Y.

[73] Assignee: **Hypoxico Inc.**, New York, N.Y.

[21] Appl. No.: **505,621**

[22] Filed: **Jul. 21, 1995**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 445,677, May 22, 1995.

[51] Int. Cl.$^6$ ............................ **A63B 23/18**; A62B 7/00; A62B 9/00; G05B 1/00

[52] U.S. Cl. ........................... **128/205.11**; 128/200.24; 128/202.12; 128/205.26; 482/13

[58] Field of Search .................. 128/200.24, 202.12, 128/202.13, 205.11, 205.12, 205.26; 482/13

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| 365,067 | 6/1887 | Harris | 128/202.12 |
|---|---|---|---|
| 375,015 | 12/1887 | Smith | 128/202.12 |
| 476,548 | 6/1892 | Nixon | 128/202.12 |
| 826,029 | 7/1906 | Harper | 128/202.12 |
| 904,172 | 11/1908 | Batter | 128/202.12 |
| 911,528 | 2/1909 | Shoemaker | 128/202.12 |
| 1,224,180 | 5/1917 | Lake | 128/202.12 |
| 1,827,530 | 10/1931 | Le Grand | 128/205.26 |
| 2,373,333 | 4/1945 | Onge | 128/202.12 |
| 3,478,769 | 11/1969 | Zavod et al. | 128/205.26 |
| 4,826,510 | 5/1989 | McCombs | 128/205.11 |
| 4,991,616 | 2/1991 | Fabregat | 128/205.11 |
| 5,061,298 | 10/1991 | Burgoyne, Jr. et al. | 128/205.11 |
| 5,082,471 | 1/1992 | Athayde et al. | 128/205.11 |
| 5,101,819 | 4/1992 | Lane | 128/205.26 |
| 5,133,339 | 7/1992 | Whalen et al. | 128/202.12 |
| 5,188,099 | 2/1993 | Todeschini et al. | 128/202.12 |
| 5,220,502 | 6/1993 | Qian et al. | 128/205.26 |
| 5,229,465 | 7/1993 | Tsuchida et al. | 128/205.11 |
| 5,263,476 | 11/1993 | Henson | 128/205.11 |
| 5,383,448 | 1/1995 | Tkatchouk et al. | 128/203.12 |
| 5,398,678 | 3/1995 | Gamow | 128/205.26 |
| 5,467,764 | 11/1995 | Gamow | 128/202.12 |

#### FOREIGN PATENT DOCUMENTS

| 185980 | 7/1986 | European Pat. Off. | 128/205.11 |
|---|---|---|---|
| 2837278 | 3/1980 | Germany | 128/205.11 |
| 3274433 | 11/1988 | Japan | 128/205.11 |
| 1274771 | 11/1989 | Japan | 128/205.11 |
| 3052631 | 3/1991 | Japan | 128/205.11 |
| 3097604 | 4/1991 | Japan | 128/205.11 |
| 3131504 | 6/1991 | Japan | 128/205.11 |
| 1223919 | 4/1986 | U.S.S.R. | 128/202.12 |
| 1338862 | 9/1987 | U.S.S.R. | 128/202.12 |
| 1456161 | 2/1989 | U.S.S.R. | 128/205.11 |
| 1680166 | 9/1991 | U.S.S.R. | 128/202.12 |
| 1688873 | 11/1991 | U.S.S.R. | 128/202.12 |
| 1718965 | 3/1992 | U.S.S.R. | 128/202.12 |

#### OTHER PUBLICATIONS

*Textbook of Medical Physiology*, Guyton, 6th ed., ©1981, W. B. Saunders Co., Part VIII & IX, pp. 541–558, 128/204.29.

*Journal of the A.S.R.E.*, "Recent Engineering Developments in Strato–Chambers", Bergdoll, Jr., Jan. 1943, pp. 25–33, 128/202.12.

*Primary Examiner*—Kimberly L. Asher

[57] **ABSTRACT**

A hypoxic room system for hypoxic training or therapy is provided which simulates oxygen-depleted mountain air. The system employs an oxygen content-reducing device (hypoxicator) which supplies oxygen-depleted air to a hypoxic training room communicating with the device and having ventilating openings for equalizing atmospheric pressure inside the hypoxic room. The system may be applied to interior space inside any structure. The hypoxicator may employ a membrane air-separation principle or a molecular sieve pressure-swing adsorption process.

**25 Claims, 4 Drawing Sheets**





Fig. 1



Fig. 2          Fig. 3



Fig. 4



Fig. 5



Fig. 6



Fig. 7



Fig. 8

Add. 6



Fig. 9



Fig. 10

5,799,652

| 1 | 2 |

# HYPOXIC ROOM SYSTEM AND EQUIPMENT FOR HYPOXIC TRAINING AND THERAPY AT STANDARD ATMOSPHERIC PRESSURE

## RELATED APPLICATION

This application is a continuation in part of the application filed May 22, 1995 by Igor K. Kotliar entitled "Apparatus for hypoxic training and therapy" and given U.S. Ser. No. 08/445,677.

## FIELD OF THE INVENTION

The present invention relates to equipment for providing oxygen-depleted air to a user for hypoxic training or therapy whereby a low-oxygen mountain air of different altitudes is simulated, and more particularly, to such equipment which regulates oxygen content and the humidity of the oxygen-depleted air being delivered for non-contact inhaling by a user.

Hypoxic training activates the immune system and protective forces of the organism, and is used for medical, health and fitness purposes. Hypoxic training is a drug-free alternative for treatment and prevention of cardiopulmonary, gastrointestinal, gynecological, skin and ocular diseases, as well as various types of allergy, neurological disturbances, and other diseases. Hypoxic Training is also successfully used for increasing strength, endurance, vitality and resistance to various diseases of healthy people and athletes.

## DESCRIPTION OF THE PRIOR ART

European Patent EP 0472 799 AL shows one type of the apparatus for Hypoxic Training on the market. The apparatus employs a powerful compressor to force air through hollow polyfiber membranes in order to provide an oxygen-depleted gas mixture to the user.

This apparatus has a number of disadvantages including excessive weight and noise level and higher than atmospheric pressure of the delivered gas mixture as well. But the main disadvantage of this and other currently available machines is the necessity of sterilization or disposal of the contaminated elements of the respiratory system and the possibility of contamination of the entire system.

The invention presented here is free of these disadvantages and provides for safe multiple use without the need to sterilize any part of the system.

## SUMMARY OF THE INVENTION

A principal object of the present invention is to provide equipment for simulating oxygen-depleted mountain air of different altitudes—preferably from 5,000 to 20,000 ft—which is necessary for hypoxic training or therapy.

Another object of the invention is to provide a system for hypoxic training and therapy consisting of a closed room having ventilating openings which communicates with a device which supplies oxygen-depleted air or nitrogen, establishing hypoxic and, if necessary, hypobaric or hyperbaric conditions inside this closed room.

A further object of the invention is to provide a collapsible hypoxic training room which may be installed in any facility and having sufficient ventilation openings in order to automatically maintain normal or hypobaric atmospheric pressure inside.

Yet a further object of the present invention is to provide a device for depleting the oxygen content of the air inside the hypoxic training room employing membrane-separation or molecular sieve-separation principles whereby an oxygen-depleted air is delivered inside a hypoxic training room for a non-contact inhalation.

A further object of this invention is to provide equipment for simulating oxygen-depleted mountain air inside a training or therapy room where the oxygen content, humidity, and temperature of such air can be regulated depending on a training or therapy protocol and a user's condition by means of manual or computerized-logic control.

Another object of this invention is to provide equipment, its installation scheme and a method for establishing hypoxic and optional hypobaric or hyperbaric conditions inside any suitable room or structure with specific ventilation conditions.

A further object of the invention is to provide a system for hypoxic training which includes exercise equipment as its integral part.

Yet another object of the invention is integrating of hypoxic training system inside a motor vehicle or other means of transportation in order to fight drowsiness and increase attentiveness of their operators.

The several embodiments presented here employ varying combinations of equipment for supplying an oxygen-depleted gas mixture for hypoxic training or therapy which requires an air composition preferably with 7% to 15% of oxygen and 93% to 85% of nitrogen.

Each embodiment presented here may be incorporated into an air-conditioning system of any room, building or structure using the systems ventilating ducts and equipment for delivery hypoxic gas mixture.

## DESCRIPTION OF DRAWINGS

FIG. 1 shows a simplified view of the preferred embodiment and the invention.

FIG. 2 is schematic view of the preferred embodiment wherein an oxygen-enriched gas mixture is extracted from the system.

FIG. 3 shows a schematic of an alternate embodiment of the invention with the outside installation of a hypoxicator.

FIG. 4 shows a schematic view of another alternate embodiment of the invention.

FIG. 5 shows a schematic of a membrane-type hypoxicator.

FIG. 6 shows a schematic of a molecular sieve-type hypoxicator.

FIG. 7 shows a schematic view of an alternate molecular sieve-type hypoxicator.

FIG. 8 shows the invented hypoxic room system, including exercise equipment, computerized control unit, humidity and temperature control unit, oxygen sensor and pulse oximeter.

FIG. 9 shows a simplified view of a building with a hypoxicator incorporated into an air conditioning system of the building.

FIG. 10 shows a simplified view of a car with a hypoxicator incorporated behind a dashboard.

## DESCRIPTION OF THE INVENTION

The object of this invention is to provide equipment which simulates oxygen-depleted mountain air of different altitudes and delivers it to a user for a non-contact inhalation in accordance with a hypoxic training or therapy protocol.

Add. 8

5,799,652

3

The system consist of two main blocks: a hypoxicator (device for supply oxygen-depleted air or nitrogen with a control unit) and a hypoxic training room which communicate with each other.

FIG. 1 shows a simplified design of a preferred embodiment 10, and FIG. 2 shows a schematic working principle of the same embodiment. A collapsible hypoxic training room 11 having soft or hard walls made preferably from a clear glass or polymer material supported on a metal or plastic framework 19 and equipped with a door 12, a ceiling 13 and an optional floor platform. There are many types of similar rooms marketed currently as "clean room" or "inhalation room" and manufactured by Liberty Industries, Simplex Inc., Clean Room Products Inc., Clestra Cleanroom, Inc. and many other companies. Most of them are suitable for presented here invention and need just a few changes, such as getting ventilating and installation openings.

A hypoxicator 15 employs almost the same working principle as is well-known in medical field membrane-type or molecular sieve-type oxygen concentrators which separate ambient air into oxygen-rich and nitrogen-rich fractions. The main difference between our hypoxicator and an oxygen concentrator is that with an oxygen concentrator, the oxygen-rich gas mixture is used and nitrogen concentrate is released into the atmosphere, and with a hypoxicator, the nitrogen-rich gas mixture is used and the oxygen concentrate is disposed of. The hypoxicator presented in this invention is also several times more productive and does not need a number of elements necessary in oxygen concentrator devices. In this invention we use a custom-made hypoxicator with membrane or molecular-sieve air separation unit being schematically shown in FIGS. 5 and 6 and described later in this document.

The hypoxicator 15 installed inside the hypoxic room 11 draws internal room air through a disposable dust and bacterial filter of intake 16 and separates it into oxygen concentrate disposed through output 17 and nitrogen concentrate being discharged inside room 11 through output 18.

The constant gas mixture withdrawal from room 11 through output 17 causes the same quantities of fresh air to be drawn in through the ventilating openings 14, keeping normal atmospheric pressure inside room 11. The air-flow capacity of openings 14 must be larger than the maximal flow of the oxygen concentrate able to be produced by the hypoxicator 15. It will allow an even atmospheric pressure inside the hypoxic room 11.

The system has a significant advantage—it allows the simulation of hypobaric conditions existing in reality on different altitudes which is important for hypoxic training and therapy. For this purpose, ventilating openings 14 may be equipped with the hypobaric valves allowing to create a necessary pressure difference inside the room 11. In this case it is advisable to reduce the number of openings 14 to one or two of a larger size. These valves (or valve) should be combined with a room pressure monitor and controlled by a computerized control unit which will change the air pressure inside the room 11 in accordance to the oxygen content level allowing perfectly-simulated mountain air conditions at different altitudes. Suitable low-pressure valves with an extremely sensitive room pressure monitor (model RPM-1) and other necessary accessories are available from MODUS Instruments, Inc.

The performance of the hypoxicator 15 must be enough to lower the oxygen content of the air inside the room 11 to desired level in a desired amount of time. Preferred are those able to produce at least 15 cubic feet (450 liters) per minute

4

of nitrogen concentrate with minimum 90% purity which should be enough for one individual training room. For larger rooms more efficient hypoxicators should be used or a sluice chamber installed at the entrance in order to save energy by frequent door openings. There is no need to make the door, wall and ceiling joins of the hypoxic room 11 absolutely airtight and it may be used without a floor platform as well.

As shown in FIG. 8, the hypoxic room must be equipped with an oxygen-content sensor 22 and an oxygen-depletion alarm 21. Suitable are those manufactured by Micro Switch(a Honeywell Div.), Sensormedics Corp., Servomex, Matheson Gas Products, Enmet Corp. and others.

The oxygen-content sensor constantly measures the oxygen content in the room and transmits the data to a computerized control unit (not shown) which controls the performance of the hypoxicator 45 to achieve and maintain desired air parameters in accordance to training or therapy protocol.

Preferred oxygen content parameters for hypoxic training or therapy lie in the range from 7% to 13% for controlled medical use and 11%–15% for public use for fitness purposes.

It is also necessary for medical purposes to employ a pulse oximeter 23 which measures $SaO_2$—blood saturation with oxygen, preferably finger type. Pulse oximeters manufactured by Nellcor Inc., Edentec, Ohmeda, Puritan-Bennet Corp. and Simed Corp. are suitable.

The oximeter 23 mounted on a finger of a user transmits constantly the pulse rate and $SaO_2$—data to the computerized control 21 unit which chooses the hypoxic parameters most suitable for a user exercising on exercise equipment 24.

A humidity and temperature control unit 20 shown in FIG. 8 may be installed in the system in order to control humidity and temperature inside the room 11.

When the room 11 is in use and the door 12 is closed, the hypoxicator 15 draws the internal room air through the intake 16 returning only the oxygen-depleted gas mixture through the output 18 and discharging the oxygen concentrate through the output 17 outside the room 11. Fresh air is drawn through the ventilating openings 14 equalizing atmospheric pressure inside the room 11 and being mixed with the incoming through the output 18 oxygen-depleted air. The oxygen content level of the air inside the room 11 drops to preset proportions which are maintained by the computerized control unit during the session time in accordance to training or therapy protocol and users conditions.

Another big advantage of the invention presented here is a gradual lowering of the oxygen content of the air inside the hypoxic room during the session which allows a better adaptation to hypoxic condition and eliminates hypoxic shock. A computerized control unit constantly informs a user about the simulated altitude he reaches during a session.

Carbon dioxide produced by a user during a training or therapy session settles because of its higher density and is removed through the low-positioned intake 16 from the room 11. Because of its permeability, which is higher than oxygen and nitrogen, carbon dioxide penetrates faster the oxygen-separating membrane of the hypoxicator 15 and is fully discharged into the atmosphere through the output 17. In case of a molecular sieve-type hypoxicator, carbon dioxide remains with the oxygen concentrate and is removed completely as well.

When the desired oxygen content level is established inside the room 11 and the computerized control unit sig-

5,799,652

nificantly reduces performance of the hypoxicator 15 the carbon dioxide constantly produced by a user will be always removed first and completely from the room 11.

Excessive moisture will be also removed from the room 11 because of the faster permeability of water vapor through the oxygen separating membrane, but the humidity of the air inside room 11 will be constantly reinstated because of the existance of ventilating openings and kinetic properties of water vapor.

FIG. 3 shows a schematic design of an alternate embodiment 30 which differs from the preferred embodiment only through the outside installation of the hypoxicator 35. The air inside the hypoxic training room 31 is drawn through the intake 36 inside hypoxicator 35 wherein it is separated into oxygen concentrate being disposed through the output 37 and oxygen-depleted gas mixture being returned through the output 38 back into room 31, etc. All other parts and devices are the same as in the preferred embodiment.

FIG. 4 shows a further alternate embodiment 40 wherein the oxygen-depleted air is pumped inside the room 41. The hypoxicator 45 installed preferably outside the room 41 draws outside air through the dust filter of the intake 46 and disposes oxygen-rich gas mixture through the output 47 blowing the oxygen-depleted air into the room 41 through the output 48.

In this embodiment ventilating openings 44 should be installed preferably in the lower portion of the room walls allowing carbon dioxide to be blown out first. The air flow capacity of the ventilating openings 44 must be greater than the volume of the incoming gas mixture by maximal performance of the hypoxicator 45, because it is necessary to keep normal atmospheric pressure inside the hypoxic training room 41.

This alternate embodiment requires a humidifier in order to reinstate the humidity of the incoming dry gas mixture to desired proportions. It is necessary because water vapor is faster than other gases in penetrating an oxygen-separating membrane which makes oxygen-depleted retentate too dry for comfortable use. In case of a molecular sieve separator water vapor is removed with the oxygen concentrate.

The preferred type of humidifier is a disc spray dispenser widely used in air conditioning systems and which can employ the power of the incoming air stream to produce micro-sized water droplets which evaporate instantly. Any other humidifiers available on the market for home or office use are suitable for the invention presented here and may be installed separately inside or outside a hypoxic room. All other parts and equipment are similar to the preferred embodiment. Hyperbaric conditions may be easily established, if necessary, employing hyperbaric valves at the ventilating openings 44 controlled by a room pressure monitor and computerized control unit similar to the preferred embodiment.

FIG. 5 shows a schematic design and a working principle of the membrane type hypoxicator 50. A compressor 51 draws an ambient air and supplies compressed air through an outlet 52 into a membrane separation unit 53 wherein it is separated into oxygen rich permeate and oxygen depleted retentate. The permeate is drawn by a vacuum pump 54 being disposed through the outlet 56 and the retentate is discharged through the conduit 55 inside the hypoxic room (not shown).

The system can also work without the vacuum pump 54 being installed here for increasing the efficiency of the separation unit 53. Otherwise, a fan or a blower may be used instead of compressor 50 in which case an efficient vacuum

pump 54 is required to achieve the highest air separation grade across the membranes of the separation unit 53.

Most suitable for invention presented here are Thomas WOBL double piston compressors (series 1207 and 2807) and Thomas WOBL piston or rotary vacuum pumps (series TF16, TF25 and 2750) manufactured by Thomas Industries, Inc.

The membrane separation unit 53 is of known construction and may consist of a set of parallel connected membrane cells or a single cell which employ either flat or capillary membranes. The inlet of the separation unit 53 receives compressed air from conduit 52, and separates the air across the membrane and delivers the oxygen-depleted retentate gas through the outlet to conduit 55. The separation results from a pressure difference created by a compressor 50 and/or vacuum pump 54 expelling the oxygen-rich permeate gas mixture as a result of this compressor and vacuum pump arrangement, the retentate gas mixture is delivered further inside a hypoxic room. Similar membrane separation units, usually with hollow-fiber-polymer membranes, are used currently in the medical oxygen-enriching devices.

The best material for the membranes is selected from the group consisting of poly(dimethylsiloxane) also referred to as PDMS or its copolymer, or poly[1-(trimethylsilyl)-1-propyne] also referred to as PMSP, available from the Sanyo Chemical Co., the Matsushita Electric Company or the General Electric Co. Also suitable for use in forming the membranes of the present invention are silicon rubber, natural rubber, carbon, polybutadiene, polystyrene, ethylcellullose, butyl rubber, Teflon-FEP, polyvinylacetate, poly(2,6-dimethylphenylene oxide) or poly(methylpentene-1). Suitable for use in forming the membranes are porous polyethylene or polypropylene available from Terumo, Bentley, Johnson & Johnson, Bard, Baxter Travenol, 3M, Shiley or Cope. Other possible materials will be apparent to those skilled in the art, who will be able to substitute equivalent materials for those enunciated here without departing from the invention.

In the preferred embodiment, membrane cells are made with a porous, tubular-shaped support structure having a permeable flat sheet membrane layer on the retentate side of the support structure, the membrane layer being preferably from highly permeable organic, synthetic, ceramic, glass, metal, composite, mineral or biologic material, or combinations thereof in symmetric, asymmetric or composite shape, porous or nonporous. Capillary or hollow-fiber membranes may also be used effectively instead of flat membranes.

Due to their kinetic properties, water vapor, carbon dioxide and oxygen penetrate faster through any kind of membranes than nitrogen, which permits a choice of the most permeable membrane under the lowest possible air pressure in order to increase an efficiency of the membrane separation unit 53.

A humidifier may be connected to hypoxicator 50, if necessary, or installed separately in hypoxic room.

FIG. 6 shows a schematic design and a working principle of the molecular-sieve type hypoxicator 60 which are almost similar to medical oxygen concentrators being commercialized since mid-1970s and operating on the original Skar-strom cycle.

A compressor 61 draws an ambient air and pressurizes it preferably up to 3 to 10 bar pressure. Compressed air is delivered through the outlet 62, switching valves block 63 and connectors 64 to adsorber bed 65 or adsorber bed 66 alternately. The molecular sieve material adsorbes nitrogen from the compressed air, allowing oxygen and other gases to pass through to disposal outlets 67 and 68.

5,799,652

| 7 | 8 |

The two sieve beds 65 and 66 are pressurized alternately in a cyclic manner whereby air flow paths 64 are switched by solenoid switching valves 63. The sieve beds are made preferably from steel used for high-pressure gas containers. As soon as sieve material in adsorber bed 65 becomes saturated with nitrogen a pressurizing valve 69 opens depressurizing bed 65, allowing nitrogen to flow through connector 71 to mixing outlet 73 connected to hypoxic room (not shown here). Some of the oxygen produced at this time by bed 66 is used to purge bed 65 (connections from outlet 68 to bed 65 and from 67 to bed 66 are not shown here in order to simplify the scheme). At that time sieve bed 66 becomes saturated with the nitrogen and a pressurizing valve 70 opens, allowing depressurization of the bed 66 and the nitrogen being flown through a tube 72 to the mixing outlet 73. The complete cycle is then repeated.

Oxygen disposal outlets 67 and 68 having pressure regulator valves 74 and 75 may join each other, allowing single-tube oxygen transmittion to a wasting point.

The performance of compressor 60 is controlled by a manual or computerized control unit constantly receiving data from an oxygen content sensor, oximeter and other electronic sensors inside a hypoxic room.

The particulary preferred materials for adsorbing nitrogen are molecular-sieve zeolites or crystalline aluminosilicates of alkali earth elements, both synthetic and natural, and Molecular-Sieve Carbon, type CMSO2, available from Calgon Corp., Bergbau-Forschung GmbH in Germany and Takeda Chemical Company in Japan. Organic zeolites, pillared interlayer clays (PILCS) and other suitable molecular sieve materials may also be made.

The productivity of the hypoxicator in this embodiment should preferably be in a range from 30 to 50 liters per minute of oxygen with 80% to 90% purity which will allow establishing of 12% $O_2$ hypoxic conditions in a 5 cubic meters (185 cubic feet) training room in approximately 10 to 20 minutes.

The most suitable compressor for this embodiment is the Thomas WOBL piston compressor. A humidifier may be connected to hypoxicator 60, if necessary, or installed separately in hypoxic room.

FIG. 7 shows a scheme of a most efficient embodiment of hypoxicator 80 employing preferably Molecular Sieve Carbon type CMSN2 in a pressure-swing adsorption system which allows to produce nitrogen with up to 99.9% purity and absolutely free from carbon dioxide.

Compressor 81 supplies air pressurized preferably up to 3 to 10 bar through the outlet 82, switching valves block 83 and connectors 84 to molecular sieve beds 85 and 86. Each sieve bed is alternately pressurized in a cyclic manner and supplies nitrogen until it becomes saturated with oxygen. Bed 85 is pressurized by closing a pressurizing valve 89 and adsorption process begins. Oxygen and carbon dioxide are adsorbed by the adsorbent and nitrogen flows through the pressure regulator valve 94 and conduit 87 to mixing outlet 93 connected to hypoxic room (not shown). When adsorbent in the bed 85 becomes saturated with oxygen a solenoid valve 83 switches the flow path of the compressed air to bed 86 which is pressurized by closing pressurizing valve 90.

At the same time, the bed 85 is depressurized by opening valve 85, allowing oxygen to escape from the adsorbent and to be disposed through the conduit 91 and outlet 96. At that time, the adsorbent in the sieve bed 86 becomes saturated with oxygen and valve 83 switches air flow path to bed 85 which is pressurized by closing valve 89. The complete cycle is then repeated.

One, three or four-bed adsorbing units may be made using the same principle, if necessary. CMSN2 is also available from Bergbau-Forshung GmbH and Takeda Chemical Company. Zeolites made of organic materials are also suitable. Under normal operating conditions, the molecular sieve is completely regenerative and will last indefinitely.

The Thomas piston compressors are most suitable for this embodiment. A humidifier may be connected to hypoxicator 80 or installed separately in hypoxic room. All necessary switches, valves, pressure regalators, manometers, pressure display-controllers and transmitters, filters, fittings and tubing are available from Modus Instruments, Inc., Victor Equipment Company and AirSep Corporation.

The invented system could be applied to any closed room or structure, such as a patient room in a hospital, residential rooms, fitness club rooms, office and conference rooms, schools and child care facilities, theatres, cinemas, restaurants and even a room inside a motor vehicle or other means of transportation. Two basic conditions must be met to build a system are sufficient ventilation of the room allowing instant reinstating of the atmospheric pressure inside the room and a safe disposal of oxygen. For instance, a hypoxicator may be installed as shown in FIGS. 1–4 inside or outside a fitness room having a sufficient ventilation through the door or window.

As shown in FIG. 9, the hypoxic room system may be easily integrated into any air conditioning system 103 of any building or structure 101 using existing ventilation ducts 104 and equipment 102 for delivery hypoxic gas mixture to any floor or room in the building. This will improve peoples state of health, increase their productivity and lower medical expenses. A hypoxicator may be incorporated into any separate room air conditioner.

The installation scheme of FIG. 4 makes the system most suitable and safe for use in a passenger car 111 or other motor vehicles with a closed passenger space as shown in FIG. 10. Since most of Americans waste hours of their active life every week inside a car some of this time could be used to their advantage—for hypoxic training.

A small, preferably 12V/DC-powered hypoxicator 112 with membrane or molecular sieve type separation principles described earlier may be installed inside a car interior or behind a dashboard. There is also enough space inside or under passenger seats. A hypoxicators delivery system may be also integrated in a ventilating system. Two conditions must be met in this embodiment in order to create an invented hypoxic room system: an outside air must be drawn for separation and an oxygen concentrate must be discharged outside a car 111. There are many openings in a car body sufficient to play a role of ventilating openings 44 and constantly equalizing air pressure in a car interior with the outside atmospheric pressure and, if necessary more openings could be made, preferably at doorjambs 113.

The lowest oxygen content of the supplied gas mixture should be preferably 13%–15% by maximal hypoxicators performance which is absolutely safe and unnoticable by a user and even may be used for fighting sleepiness and increasing attentiveness and vitality. In case of a membrane-type hypoxicator it is simple to preset the performance of the separation unit for a steady supply of the air with 13–15% of oxygen.

In case of a molecular sieve adsorption separator, the produced nitrogen should be mixed with the fresh air in proportion 1:2.5 which makes the air with exactly 15% of oxygen. The mixing must be safe and automatically which may be achieved by transmitting nitrogen through "Y"-

5,799,652

| 9 | 10 |

shaped mixing adapter with a larger fresh air intake opening, allowing 2.5 times more ambient air than nitrogen to be automatically sucked into the system for mixing. This and a computerized control unit with the oxygen-depletion alarm will insure the safety of the system for hypoxic training inside a car.

The installation scheme shown on FIG. 2 is also suitable for closed-type motor vehicles. In this case, car ventilation ducts and other car body openings play the role of ventilation openings 14. An oxygen concentrate may be discharged to outside through any specially made opening for outlet 17. The best place for incorporating outlet 17 is an outside mirror supporting structure because it communicates with the a car interior through the mirror adjustment mechanism wherein a connection tubing should be installed inside the mirror supporting structure ending with a specially made opening outside and with the connector at inner panel of the door for hypoxicators outlet 17.

An inhalation mask with hypoxic air supply tubing retractable from a dashboard or other interior part may be also installed for individual hypoxic training inside a motor vehicle. In this case a mask should be preferably handheld, without any straps, which is safer. This application is most beneficially for a long-distance truck drivers or train operators. A motorist, feeling drowsy, could take a 3–5 minute session of hypoxic inhalation which will significantly increase his cardiopulmonary activity, attention and vitality.

Car manufacturers could easily integrate this invention in a ventilating system of a vehicle as an additional luxury feature. The presented here invention may be marketed as an anti-sleep mode device for operators of any means of transportation. The system can switch on automatically if a user wears on a finger or another body part a pulse oximeter connected to a computerized or fuzzy logic control unit. When a pulse rate of a user drops to the lowest for this individual level a system will be switched on automatically and hypoxic conditions will be established for a time, necessary to increase user activity to desired level. A blood saturation with oxygen is also under constant control.

A big advantage of the invented system for this application is that it does not disturb a user and does not cause a "panic effect" which is genetically preset in humans if a part of the oxygen in the air is replaced by carbon dioxide. The system may be successfully used for hypoxic training of mammals as well.

What is claimed is:

1. A system for use in an external atmospheric environment of air at an external ambient air pressure and having an ambient oxygen concentration for providing a reduced-oxygen atmosphere to a user, said system comprising:

a gas separation device having an inlet intaking an intake gas mixture and first and second outlets, said first outlet transmitting a first gas mixture derived from said intake gas mixture and having a higher oxygen content than the intake gas mixture and said second outlet transmitting a second gas mixture derived from said intake gas mixture and having a lower oxygen content than the intake gas mixture;

a breathing chamber having an internal space therein containing air and including an entry communicating with said internal space and through which the user can enter said internal space;

said second outlet communicating with said internal space and transmitting said second mixture to said internal space so that said second mixture mixes with the air in the internal space;

said first outlet transmitting said first gas mixture to the external atmospheric environment; and

said breathing chamber permitting the communication of air in at least one direction between the external atmospheric environment and the internal space and in combination with the gas separation device, maintaining the air in the internal space at a pressure generally equalized with the ambient air pressure of the external atmospheric environment and at a substantially constant concentration of oxygen substantially lower than said external ambient oxygen concentration.

2. The invention according to claim 1 and

said inlet of said gas-separation device intaking the intake gas mixture from the air in said space.

3. The invention according to claim 1 and

said inlet of said gas-separation device intaking the intake gas mixture from the air of said external atmospheric environment.

4. The invention according to claim 1 and

said breathing chamber having vents therein, said vents providing for flow of air between said external atmospheric environment and said internal space.

5. The invention according to claim 4 and

said vents having apertures therein through which air can flow in either direction between said internal space and said external atmospheric environment.

6. The invention according to claim 1 and

the air in the internal space having an oxygen concentration of about 7 to 11%.

7. The invention according to claim 1 and

exercise equipment for training of said user in said internal space of said breathing chamber.

8. The invention according to claim 7 wherein said user is a non-human mammal.

9. The invention according to claim 1 and

the air in the internal space having an oxygen concentration of about 11 to 15%.

10. The invention according to claim 1 and

said entry having a doorjamb structure defining an entry opening in the chamber through which the user can enter the chamber and a door covering said opening, the doorjamb structure permitting passage of air between the internal space and the external environment.

11. A system for use in an external atmospheric environment of air at an external ambient air pressure for providing a low-oxygen environment for a user, said system comprising:

a chamber comprising a door and wall structure defining a closed space into which the user can enter through the door;

a gas processing device having an intake and first and second outlets, said device intaking a gas mixture through said intake and emitting a reduced oxygen gas mixture having a lower concentration of oxygen than said gas mixture through said first outlet and emitting an enriched-oxygen gas mixture having a greater concentration of oxygen than said gas mixture through said second outlet;

said first outlet being connected with said chamber so that the reduced-oxygen gas mixture is emitted into said closed space inside the chamber and mixes with the air therein;

said chamber having apertures therein allowing communication therethrough of air in the outside environment with air in the chamber, said chamber and said gas

5,799,652

11

processing device maintaining the air in the closed space at a pressure substantially equal to the external ambient air pressure and at a substantially constant oxygen concentration lower than the air outside the chamber;

said gas processing device comprising a separation unit to which the intake gas mixture from the inlet is transmitted, said separation unit separating the intake gas mixture into a reduced oxygen gas mixture with an oxygen concentration lower than said intake gas mixture and an enriched oxygen gas mixture with an oxygen concentration higher than said intake gas mixture, said separation unit having a reduced oxygen mixture conduit through which said reduced oxygen gas mixture is transmitted and an enriched oxygen mixture conduit through which said enriched oxygen gas mixture is transmitted;

said first outlet being operatively associated with said reduced oxygen mixture conduit and receiving said reduced oxygen gas mixture therefrom, said second outlet being operatively associated with said enriched oxygen mixture conduit and receiving said enriched oxygen gas mixture therefrom and releasing said enriched oxygen gas mixture to the external atmospheric environment.

12. The invention according to claim 11 and

said separation unit comprising

a housing defining a space therein and having a separating membrane supported therein dividing the space into a retentate space and a permeate space, and

a pump pumping said intake gas mixture across said membrane and said intake gas mixture to be separated thereby into oxygen enriched permeate in said permeate space which is transmitted to said second outlet and oxygen depleted retentate in said retentate space which is transmitted to said first outlet and released inside said chamber.

13. The invention according to claim 11 and

said separation unit comprising a pump applying said intake gas mixture to a pressure swing adsorption device having molecular sieve material which adsorbs nitrogen from the intake gas mixture being compressed by said pump, leaving the enriched oxygen gas mixture which is transmitted to said enriched oxygen conduit and is discharged to the external atmospheric environment outside said chamber and said adsorption device on depressurization releasing a nitrogen concentrate gas which is transmitted as said reduced oxygen gas mixture to said reduced oxygen conduit and is released into said chamber.

14. The invention according to claim 11 and

said separation unit comprising a pump applying said intake gas mixture to a pressure swing adsorption device having molecular sieve material which adsorbs oxygen from the intake gas mixture being compressed by said pump leaving the reduced oxygen gas mixture which is transmitted to said reduced oxygen conduit and released into said chamber and said adsorption device on depressurization releasing an oxygen concentrate gas which is transmitted as said enriched oxygen gas mixture to said enriched oxygen conduit and is discharged to the outside environment.

15. The invention according to claim 11 and

said intake communicating with said closed space inside the chamber so that the intake gas mixture is drawn from the air in the chamber.

12

16. The invention according to claim 15 and

said apertures in said chamber being located in an upper portion of the chamber.

17. The invention according to claim 11 and

said intake intaking the intake gas mixture from the air of the external atmospheric environment outside the chamber.

18. The invention according to claim 17 and

said apertures in said chamber being located in a lower portion of the chamber.

19. The invention according to claim 11 and

said apertures providing openings in said wall structure.

20. The invention according to claim 11 and

said chamber being part of a vehicle and said user being an operator of said vehicle;

said system selectively supplying a hypoxic environment to said operator so as maintain the alertness of said operator.

21. A system for hypoxic training and therapy simulating an oxygen-depleted mountain air of a higher altitude, said system comprising:

a structure defining a closed space therein, said structure having a door and ventilating openings through which air can pass so that air in the closed space and air outside said structure remain at substantially equal pressures;

an oxygen content-reducing device separating an intake air mixture drawn from said air outside said structure into an oxygen concentrate and a nitrogen concentrate;

said oxygen content-reducing device transmitting said nitrogen concentrate through an outlet communicating with said closed space and causing said air in said closed space to be reduced in oxygen content relative to the air outside the structure, said device transmitting said oxygen concentrate through a second outlet to a location outside said structure;

a control unit controlling the operation of said oxygen content-reducing device;

an oxygen content sensor monitoring an oxygen content level inside said closed space and communicating with said control unit so that the oxygen content of the air in the closed space is maintained at a substantially constant desired level.

22. The invention according to claim 21 and

said system having a humidity and temperature control unit regulating humidity and temperature of the air inside said closed space.

23. The invention according to claim 21 and

said system having a pulse oximeter monitoring the user's pulse rate and blood saturation with oxygen; said oximeter transmitting data to said control unit; and

said control unit regulating the oxygen content of the air in the closed space responsive to said data.

24. The invention according to claim 21 and

physical exercise equipment inside said closed space.

25. The invention according to claim 21 and

said structure defining said closed space being a part of a building, and

said oxygen content-reducing device is incorporated into an air-conditioning system of said building and using ventilation ducts of the building for delivery of said nitrogen concentrate to said closed space.

* * * * *

US005964222A

# United States Patent [19]

## Kotliar

[11] **Patent Number:** 5,964,222

[45] **Date of Patent:** *Oct. 12, 1999

[54] **HYPOXIC TENT SYSTEM**

[76] Inventor: **Igor K. Kotliar**, 50 Lexington Ave., Suite 249, New York, N.Y. 10010

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/985,104**

[22] Filed: **Dec. 3, 1997**

### Related U.S. Application Data

[63] Continuation-in-part of application No. 08/505,621, Jul. 21, 1995, Pat. No. 5,799,652, application No. 08/739,379, Oct. 29, 1996, abandoned, and application No. 08/797,242, Feb. 8, 1997, Pat. No. 5,924,419.

[60] Provisional application No. 60/055,087, Jul. 31, 1997.

[51] **Int. Cl.**[6] .................................................... **A61G 10/00**

[52] **U.S. Cl.** ................................. **128/205.26;** 128/205.11

[58] **Field of Search** .......................... 128/205.26, 205.11, 128/202.12, 200.24, 204.18, 204.21; 600/21

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

5,799,652   9/1998   Kotliar ................................. 128/205.11

*Primary Examiner*—John G. Weiss
*Assistant Examiner*—Charles W. Anderson

[57] **ABSTRACT**

Hypoxic tent system represents a portable travel version of Hypoxic Room System and is designated mostly for passive hypoxic training of athletes during rest. The system consists of a light portable tent, which can be easily erected on a bed or mattress. The tent is supported by a supporting structure, which can be disassembled in segments or deflated. Oxygen-depleted air is transmitted inside the tent by hypoxic generator, which employs membrane separation or pressure-swing adsorption principles for extracting oxygen from ambient air. Oxygen-depleted air is also filtered by HEPA filter and may be chilled by an optional air cooler. Hypoxic tent system can be easily packed in a travel case and installed in any hotel room by attaching to a bed. Hypoxic tent system provides a low-oxygen environment with preferably 11 to 15% oxygen and can also be used by disabled for exercising their cardiopulmonary systems, increasing strength, endurance and boosting immunity.

**19 Claims, 1 Drawing Sheet**





5,964,222

1

# HYPOXIC TENT SYSTEM

This appln. claims the benefits of U.S. Provisional Appln. No. 60/055,087 filed Jul. 31, 1997, a continuation in part of patent applications Ser. No. 08/505,621 now U.S. Pat. No. 5,799,652. "Hypoxic Room System and equipment for hypoxic training and therapy," filed Jul. 21, 1995, which is a C-I-P of Ser. No. 08/739,379 now abandoned. "Hypoxic flow system for individual active and passive hypoxic training," filed Oct. 29, 1996, which is a C-I-P of Ser. No. 08/797,242. Allowed "Apparatus for passive hypoxic training and therapy," filed Feb. 8, 1997 now U.S. Pat. No. 5,924,419.

## FIELD OF INVENTION

This invention relates to enclosed low-oxygen environments created for resting in for the purposes of improving the cardio-pulmonary system of professional athletes, and for improving the health of any user, including the sick, injured and disabled.

The Hypoxic Tent System provides a safe low-oxygen environment at normal atmospheric pressure at simulated altitudes up to 15,000 feet or higher for sleeping in.

The benefits of the inhalation of low oxygen gas mixtures are fully described in previous patent applications Ser. Nos. 08/505,621, 08/739,379 and 08/797,242, and have recently been the focus of worldwide media attention. An athlete sleeping at a simulated altitude will increase his pulmonary ventilation and red blood cell count, and will need less oxygen to achieve the same performance level. This means his performance will improve in a normal oxygen environment. Hypoxic training may also be used in preparation for competition at high altitudes.

The invention presented here provides a convenient, low cost solution to create such an environment for sleeping. This invention makes it possible to make a portable version of the Hypoxic Room System, convenient for athletes while traveling, and may be easily installed at home or in any hotel room.

The Hypoxic Tent System can also be used as a therapeutic device to increase strength and endurance and boost immunity. The disabled can use this system for training their cardio-pulmonary systems.

## PRIOR ART

The U.S. Pat. No. 5,467,764 of Nov. 21, 1995, "Hypobaric Sleeping Chamber," shows hypobaric sleeping chamber, which is used by some athletes for sleeping in for the purposes of improving pulmonary performance. This invention has significant drawbacks. Firstly, this chamber must be completely sealed, which requires rigid construction and is unsafe. Also, it has a negative psychological effect, since the user is cut off from the outside world and is confined inside a narrow tube. Further, the low pressure and dryness created inside this chamber can cause rapid dehydration, enlargement of internal organs, headaches, and irritation of the sinus and respiratory system.

## DESCRIPTION OF THE INVENTION

FIG. 1 shows a schematic view of the most preferred embodiment 10. A tent 11 is fitted onto a bed 14 and upheld by supporting arches 12 and 13, which are first fastened onto the sides of a mattress 15 preferably by means of a drawstring or an elastic band (not shown). Tent 11, having a drawstring 16 with a locking device 17 at its bottom edge, is additionally tightened over the sides of mattress 15.

2

Tent 11 is made of light, thin fabric such as parachute nylon or synthetic material such as clear vinyl or a combination of both. The most preferred material is one which will allow the fast diffusion of moisture from tent 11. Tent 11 has an entryway 18, which can be closed preferably by a zipper, ziploc mechanism, Velcro, magnetic tape or other closing device, openable and closeable from the inside or outside of tent 11.

Supporting arches 12 and 13 are preferably made from light metal or plastic tubes which can be disassembled in segments. Arch 13 is fitted to tubing 20 on one end, is closed on the other end and has discharge nozzles 19 inside tent 11. A hypoxicator 21, described in previous patent applications, supplies low oxygen air into tent 11 through tubing 20, arch 13 and discharge nozzles 19.

Tent 11 can also have an inflatable supporting structure instead of the supporting tubing of arches 12 and 13.

A filter 22 filters the low oxygen air of airborne particles and bacteria. The most preferred type of filter is a HEPA filter, which is widely available from a number of manufacturers. An optional air cooling device 23 may be installed in the system to cool the low oxygen air for comfort. The cooling effect may also be achieved by increasing the length of tubing 20 if the ambient air outside tent 11 is already cool. For hot and humid climates, a separate air conditioning unit (not shown) may be installed instead of cooling device 23. This separate air conditioning unit would draw in air from tent 11, cool and dehumidify it and recirculate it back into tent 11. However, in most cases, excessive water vapor and carbon dioxide, much faster than other gases, will quickly diffuse through the fabric of tent 11, and will escape along with exiting air.

Hypoxicator 21 draws ambient air in and separates it into oxygen enriched and oxygen depleted fractions, employing membrane separation or pressure-swing adsorption technologies. The oxygen enriched fraction is expelled from hypoxicator 21 and the oxygen depleted fraction, having an oxygen content preferably from 11 to 15 percent, is constantly pumped into tent 11. A standard hypoxicator made by Hypoxico Inc. supplies approximately 60 liters/minute of hypoxic air with a 15% oxygen content, which corresponds to an altitude of 8,500 feet, providing the most suitable and safe environment for hypoxic training during sleep. Air pressure remains near normal inside tent 11 as a result of air exiting from naturally existing gaps in the tent construction, which does not have to be airtight. For example, air can exit around the zipper or other closing mechanism of entryway 18, as a result of the looseness of drawstring 16 and through fabric pores. Additional air escape openings may be provided as well, if necessary.

Hypoxic tent system can be easily disassembled and packed in luggage.

What is claimed is:

1. A system for providing a reduced-oxygen atmosphere for breathing to a user at rest, said system comprising:

an oxygen-extraction device having an inlet taking in ambient air and an outlet for transmitting oxygen-depleted air;

a portable tent having internal space therein and an entry communicating with said internal space and through which the user can enter said internal space; said tent having collapsible supporting structure;

said outlet communicating with said internal space and transmitting said oxygen-depleted air to said internal space;

said internal space communicating with an external environment through naturally existing gaps and fabric

5,964,222

3

pores, allowing excess air to escape said internal space and equalizing atmospheric pressure inside said tent to the outside parameter.

**2**. The system according to claim **1** and said entry closable by zipper, ziploc mechanism, hook and fastener or magnetic tape, and when closed, dividing said internal space from the external atmosphere.

**3**. The system according to claim **1** and said hypoxic tent made of soft synthetic or natural material and supported by supporting structure, which is inflatable or assembled from segments made from metal, plastic or composite material.

**4**. The system according to claim **1** and said hypoxic tent being attached to mattress or having mattress inside, allowing user to rest inside said internal space while inhaling oxygen-depleted air.

**5**. The system according to claim **1** and said outlet communicating with said internal space through air filter and optional air cooling device.

**6**. A portable travel system for providing a low-oxygen environment to a user for sleeping comprising:

a breathing tent comprising soft walls supported by a supporting structure and an entry defining a closed space for, accessible to the user through said entry being selectively closable so that when closed, the tent is substantially isolated from the outside environment;

a gas-processing device having outlet communicating with said closed space and transmitting oxygen-depleted gas mixture through said outlet inside said closed space.

**7**. The travel system according to claim **6** and said breathing tent designed to be attached to a resting platform, mattress or bed, allowing the user to rest or sleep inside said tent.

**8**. The travel system according to claim **6** and said portable travel system designed for quick and easy installation and disassembly at home or hotel room.

4

**9**. The travel system according to claim **6** and said portable system designated for use by athletes while sleeping or resting in order to improve their performance in normal oxygen environment.

**10**. The system according to claim **6** and said portable system designated for therapeutic use to increase strength and endurance and boost immunity.

**11**. The system according to claim **6** and said portable system designated for use by disabled to train their cardio-pulmonary systems.

**12**. The travel system according to claim **6** and said tent made of material allowing water vapor to diffuse through.

**13**. The travel system according to claim **6** and said supporting structure made of metal or plastic segments.

**14**. The travel system according to claim **6** and said supporting structure being inflatable to support said breathing tent.

**15**. The system according to claim **6** and said gas-processing device employing membrane air-separation technology to provide said oxygen-depleted gas mixture.

**16**. The system according to claim **6** and said gas-processing device employing pressure-swing adsorption technology to provide said oxygen-depleted gas mixture.

**17**. The system according to claim **6** and said oxygen-depleted gas mixture being cleaned by HEPA filter and chilled by air cooler before entering said closed space inside said tent.

**18**. The system according to claim **6** and said low-oxygen environment having oxygen content from 11% to 15% at sea level.

**19**. The system according to claim **6** and said portable travel system which can be disassembled and packed in luggage for travel.

*    *    *    *    *

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on this the 11th day of September, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered users:

Charles D. Hoffmann
HOFFMANN MARSHALL STRONG LLP
116 W 23rd St.
New York, NY 10011
(646) 741-4501

*Counsel for Cross-Appellant*

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES
421 East Franklin Street, Suite 230
Richmond, VA 23219

## CERTIFICATE OF COMPLIANCE
### With Type-Volume Limitation, Typeface Requirements, And Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

      this brief contains <u>13,232</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 Times New Roman</u>.


Dated:  September 11, 2014        /s/ Roger S. Thompson
                                  Roger S. Thompson
                                  THE LAW OFFICES OF
                                    ROGER S. THOMPSON
                                  116 Pinehurst Ave., Suite D-14
                                  New York, NY  10033
                                  (212) 923-5145

                                  *Counsel for Appellant*